# FLORIDA v. RODRIGUEZ

No. 83–1367.   Decided November 13, 1984

2

PER CURIAM.

Respondent Damasco Vincente Rodriguez was charged in a Florida state trial court with possession of cocaine with intent to distribute. The State claimed that on September 12, 1978, he had attempted to transport three pounds of cocaine contained in his luggage through the Miami International Airport. Cocaine seized from the respondent following an examination of his luggage at the airport was suppressed by the Florida trial court on the grounds that respondent's rights under the Fourth and Fourteenth Amendments to the United States Constitution had been violated by the search. The Florida District Court of Appeal affirmed the judgment in a *per curiam* opinion, citing its earlier decision in *State* v. *Battleman*, 374 So. 2d 636 (1979). *State* v. *Rodriguez*, 389 So. 2d 4 (1980). This Court originally denied certiorari, *Florida* v. *Rodriguez*, 451 U. S. 1022 (1981), but two years later granted rehearing and remanded the case to the Florida District Court of Appeal for reconsideration in the light of our opinions in *Florida* v. *Royer*, 460 U. S. 491 (1983). *Florida* v. *Rodriguez*, 461 U. S. 940 (1983). The Florida District Court of Appeal again affirmed the suppression of the evidence in a one-word order, 443 So. 2d 995 (1983), and the State has again petitioned for certiorari. Because of the

Florida court's suppression of the evidence against him prior to trial, respondent has never been tried for the drug offense with which he was charged, and his former attorneys have advised this Court that he is currently a fugitive from justice.

The only witness to testify at the suppression hearing was Officer Charles McGee, who was a police officer with the Dade County Public Safety Department. McGee testified that he had received about 40 hours of narcotics training in the police academy and, after being assigned to the Narcotics Squad, a 5-week course from the Organized Crime Bureau, which included one-and-one-half to two weeks of training in narcotic surveillance and drug identification. He had received further training under the auspices of the Drug Enforcement Administration, and at the time of his testimony he had 18 months' experience with the airport unit. He also testified that Miami was a "source city" for narcotics.

McGee testified that he first noticed respondent Rodriguez at the National Airlines ticket counter in the Miami Airport shortly after noon on September 12, 1978. McGee's attention was drawn to respondent by the fact that he and two individuals later identified as Blanco and Ramirez behaved in an unusual manner while leaving the National Airlines ticket counter in the Miami Airport. McGee and Detective Facchiano, who were both in plain clothes, followed respondent, Ramirez, and Blanco from the ticket counter to the airport concourse from which National Airlines flights departed. Ramirez and Blanco stood side by side on an escalator, and respondent stood directly behind them. The detectives observed Ramirez and Blanco converse with one another, although neither spoke to respondent. At the top of the escalator stairs, Blanco looked back and saw the detectives; he then spoke in a lower voice to Ramirez. Ramirez turned around and looked directly at the detectives, then turned his head back very quickly and spoke to Blanco.

As the three cohorts left the escalator single file, Blanco turned, looked directly at respondent, and said, "Let's get out of here." He then repeated in a much lower voice, "Get

4

out of here." Respondent turned around and caught sight of the detectives. He attempted to move away, in the words of Officer McGee, "His legs were pumping up and down very fast and not covering much ground, but the legs were as if the person were running in place." App. to Pet. for Cert. 49. Finding his efforts at flight unsuccessful, respondent confronted Officer McGee and uttered a vulgar exclamation.

McGee then showed his badge and asked respondent if they might talk. Respondent agreed, and McGee suggested that they move approximately 15 feet to where Blanco and Ramirez were standing with Facchiano, who now also had identified himself as a police officer.

They remained in the public area of the airport. McGee asked respondent if he had some identification and an airline ticket. Respondent said that he did not, but Ramirez then handed McGee a cash ticket with three names on it—Martinez, Perez, and Rodriguez. In the ensuing discussion, McGee asked respondent what his name was and he replied "Rodriguez"; McGee then asked Blanco what *his* name was and he, too, answered "Rodriguez." Blanco later identified himself correctly. At this point, the officers informed the suspects that they were narcotics officers, and they asked for consent to search respondent's luggage. Respondent answered that he did not have the key, but Ramirez told respondent that he should let the officers look in the luggage, which prompted respondent to hand McGee the key. McGee found three bags of cocaine in the suit bag, and arrested the three men. McGee testified that until he found the cocaine, the three men were free to leave. He also testified that he did not advise respondent that he could refuse consent to the search.

The order of the Florida trial court granting the motion to suppress the cocaine reads as follows:

> "1. There was no reason to stop the defendant, Damasco Vincente Rodriguez. The Defendant did nothing which would arouse an articulable suspicion in the eyes of Detective McGee and Detective Facchiano.

"2. Due to the lack of telling the Defendant he had a right to leave, and the lack of telling the Defendant he had a right to refuse to consent to a search, there was an insufficient showing that the consent herein was completely untainted due to the lack of the two things previously mentioned.

"3. The statement made by the Defendant's companion did not overcome the taint from the initial illegal stop of the Defendant."   App. to Pet. for Cert. 89–90.

We think that the trial court's order as affirmed by the District Court of Appeal reflects a misapprehension of the controlling principles of law governing airport stops enunciated by this Court in *United States* v. *Mendenhall,* 446 U. S. 544 (1980), and *Florida* v. *Royer,* 460 U. S. 491 (1983).   Because its ruling was made in May 1979, the trial court obviously cannot be faulted for lack of familiarity with these opinions, but the District Court of Appeal's final affirmance of the suppression order on remand from this Court occurred on November 15, 1983, after these opinions had been issued. We think the trial court's order also reflects a misapprehension of legal principles enunciated in *Schneckloth* v. *Bustamonte,* 412 U. S. 218 (1973).

Certain constraints on personal liberty that constitute "seizures" for purposes of the Fourth Amendment may nonetheless be justified even though there is no showing of "probable cause" if "there is articulable suspicion that a person has committed or is about to commit a crime."   *Florida* v. *Royer, supra,* at 498 (opinion of WHITE, J.).   Such a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry* v. *Ohio,* 392 U. S. 1 (1968), and is permissible because of the "public interest involved in the suppression of illegal transactions in drugs or of any other serious crime." *Royer, supra,* at 498–499.

The initial contact between the officers and respondent, where they simply asked if he would step aside and talk with them, was clearly the sort of consensual encounter that im-

plicates no Fourth Amendment interest. *United States* v. *Mendenhall, supra,* at 554 (opinion of Stewart, J.); *Florida* v. *Royer, supra,* at 497 (opinion of WHITE, J.). Assuming, without deciding, that after respondent agreed to talk with the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage, there was a "seizure" for purposes of the Fourth Amendment, we hold that any such seizure was justified by "articulable suspicion."

Before the officers even spoke to the three confederates, one by one they had sighted the plainclothes officers and had spoken furtively to one another. One was twice overheard urging the others to "get out of here." Respondent's strange movements in his attempt to evade the officers aroused further justifiable suspicion, and so did the contradictory statements concerning the identities of Blanco and respondent. Officer McGee had special training in narcotics surveillance and apprehension; like members of the Drug Enforcement Administration, the Narcotics Squad of the Dade County Public Safety Department is "carrying out a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution." *United States* v. *Mendenhall, supra,* at 562 (POWELL, J., concurring in part and concurring in judgment). Respondent "was approached in a major international airport where, due in part to extensive antihijacking surveillance and equipment, reasonable privacy expectations are of significantly lesser magnitude . . . ." *Florida* v. *Royer, supra,* at 515 (BLACKMUN, J., dissenting).

We hold, therefore, that the trial court was incorrect both in its conclusion that there was no articulable basis for detaining respondent and in its conclusion that there was "taint" resulting from this initial stop. In *Schneckloth* v. *Bustamonte, supra,* we held that the State need not prove that a defendant consenting to a search knew that he had the right to withhold his consent, although we also held that

knowledge of the right to refuse consent could be taken into account in determining whether or not a consent was "voluntary." We are unable to determine from the trial court's opinion whether its conclusion with respect to the voluntariness of the consent to search the luggage would have been the same had it correctly applied the governing legal principles embodied in the Fourth Amendment.

The petition for writ of certiorari is therefore granted, the judgment of the Florida Court of Appeal is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL dissents.

JUSTICE STEVENS, with whom JUSTICE BRENNAN joins, dissenting.

With increasing frequency this Court seems prone to disregard important differences between cases that come to us from state tribunals and those that arise in the federal system. See *Secretary of State of Maryland* v. *Joseph H. Munson Co.*, 467 U. S. 947, 970 (1984) (STEVENS, J., concurring). As the Court of last resort in the federal system, we have supervisory authority and therefore must occasionally perform a pure error-correcting function in federal litigation. We do not have comparable supervisory responsibility to correct mistakes that are bound to occur in the thousands of state tribunals throughout the land. The unusual action the Court takes today illustrates how far the Court may depart from its principal mission when it becomes transfixed by the specter of a drug courier escaping the punishment that is his due.

I

Some five years ago a Florida trial judge conducted the suppression hearing in this case and a county narcotics officer testified at some length. The transcript contains a somewhat improbable account of the respondent either running in place or frantically running in circles in the presence of the

agent,[1] and the agent identifying himself to the respondent as a police officer in order to be sure he would not be mistaken for a member of the Hare Krishna.[2]

---

[1] "THE WITNESS: He was moving in a direction to the left. His legs were pumping up and down very fast and not covering much ground, but the legs were as if the person were running in place. You might say moving slightly to the left. There's a wall or partition there. He ran through that partition and in the area just enclosed off.

"THE COURT: Did he run or walk?

"THE WITNESS: Neither. He was pumping up and down.

"THE COURT: You said he ran up a minute ago. Did he go from a walk to pumping to a run?

"THE WITNESS: Well, Your Honor, I don't know what the right word would be, but his feet are running up and down but he ain't going nowhere except a little at a time.

"Do you understand what I'm saying?

"[THE PROSECUTOR:] Detective McGee, can you come down from the witness stand and show us.

"THE COURT: Like running in place?

"THE WITNESS: Sort of like this (indicating).

"To demonstrate, he was stamping with his suitcase and shoulder bag when the guy told him in a strained tone to get out of here. He turned and looked at me. He was going like that. He didn't know what to do. He was just going crazy. His feet was going up and down and he was moving, but—

"THE COURT: All right. Have a seat.

. . . . .

"[THE WITNESS:] He then turned and came back out and passed me again still in the same pumping fashion and went to the other side of the escalator to my right. I am standing there just watching the guy running around in circles.

"THE COURT: Maybe that's the way he walks." Tr. 52–54.

[2] "[THE WITNESS:] I identified myself as a police officer for a couple of purposes: Because the observations I had made, number one; number two, so that at the airport when we do in fact ask someone to talk to us, we properly identify ourselves so they do not think we are Hare Krishnas or someone trying to rip them off or something in that manner.

"We identify ourselves as a police officer. I do so to show my respectability of the person and in fact that I would just like to hold some conversation with him.

"THE COURT: Don't Hare Krishnas usually have their heads shaved?" *Id.*, at 64–65.

After hearing all of the officer's testimony, the trial judge stated:

> "Counsel, I am going to rule as a matter of fact that they did nothing wrong, that there was no reason to stop these men for contact or for any other reason at that point in time. The whole case hinges on whether or not there was consent given subsequent to that time. Let me hear your argument to that." Tr. 104.

After hearing argument, the judge ruled that respondent had not voluntarily consented to a search of his luggage. In making that ruling, the judge relied, in part, on the fact that the narcotics agent had not advised the respondent that he had a right to refuse to consent to the search.

Today this Court holds (1) that the officer did have an "articulable suspicion" that justified a temporary seizure of respondent's person; and (2) that the trial judge did not articulate a legally sufficient basis for his conclusion that respondent did not voluntarily consent to the search of his bag. Accordingly, the Court remands the case to the Florida District Court of Appeal for further proceedings.

To understand the unusual nature of this disposition, it is necessary to comment on some of the events that have transpired in this litigation during the past five years.

## II

On September 23, 1980, after full argument, the District Court of Appeal of Florida for the Third District filed an opinion which reads in its entirety as follows:

> "PER CURIAM.
> "Affirmed on the authority of State v. Battleman, 374 So. 2d 636 (Fla. 3d DCA 1979)." State v. Rodriguez, 389 So. 2d 4.

The Florida Attorney General did not ask the Florida Supreme Court to review that decision. He did not do so because the Florida appellate system has been carefully structured to enable the State's highest court to concentrate

on matters of greater public importance than the possibility that a trial judge's error might not have been corrected by the intermediate court of appeal. As the Florida Supreme Court explained in a 1958 opinion:

> "We have heretofore pointed out that under the constitutional plan the powers of this Court to review decisions of the district courts of appeal are limited and strictly prescribed. . . . The revision and modernization of the Florida judicial system at the appellate level was prompted by the great volume of cases reaching the Supreme Court and the consequent delay in the administration of justice. The new article embodies throughout its terms the idea of a Supreme Court which functions as a supervisory body in the judicial system for the State, exercising appellate power in certain specified areas essential to the settlement of issues of public importance and the preservation of uniformity of principle and practice, with review by the district courts in most instances being final and absolute." *Ansin* v. *Thurston*, 101 So. 2d 808, 810, quoted with approval in *Jenkins* v. *State*, 385 So. 2d 1356, 1357 (Fla. 1980).

Recognizing that the Florida Supreme Court does not provide a forum for error-correcting review of lower court judgments in that State's judicial system, the Florida Attorney General instead filed a petition for writ of certiorari in this Court. Because the petition did not present any question of general significance, on May 26, 1981, this Court wisely denied certiorari. *Florida* v. *Rodriguez*, 451 U. S. 1022. Presumably because they were convinced that error had been committed, three Members of the Court dissented from that disposition and stated that they "would grant certiorari and reverse the judgment." *Ibid.*[3] The Attorney General of Florida then filed a timely petition for rehearing.

---

[3] The suggestion of summary reversal by the three Justices underscores the point that no one has ever considered this case worthy of plenary review by this Court.

## III

Rule 51.2 of this Court's Rules requires that the grounds set forth in a petition for rehearing "must be limited to intervening circumstances of substantial or controlling effect or to other substantial grounds not previously presented." The principal ground advanced by Florida in its petition for rehearing was that a succession of clearly erroneous *per curiam* decisions of the State District Court of Appeal was having a devastating effect on its prosecutions. As an "intervening circumstance," it noted that the State had filed a petition for certiorari in *Florida* v. *Royer*, 460 U. S. 491 (1983). In my opinion neither of these grounds satisfied the terms of our Rule. In any event, the petition for a rehearing remained on the Court's docket for the next two years.

Rule 51.3 provides that no petition for a rehearing will be granted without an opportunity to submit a response. In 1983, when respondent was at long last asked to respond to the State's petition, we learned that he was a fugitive from justice and no longer was represented by counsel. On May 23, 1983, the Court entered an order granting the petition for rehearing, vacating the judgment of the District Court of Appeal and remanding the case to that court for reconsideration in the light of our opinions in *Florida* v. *Royer*. *Florida* v. *Rodriguez*, 461 U. S. 940.

## IV

On November 15, 1983, the District Court of Appeal of Florida filed an order which reads, in its entirety, as follows:
"PER CURIAM. Affirmed."
The Attorney General thereafter filed another petition for certiorari in this Court,[4] and today the Court rewards him

---

[4] Because the District Court of Appeal's decision in this case was rendered without any statement of reasons, it does not "expressly" decide a constitutional question or "expressly" conflict with other authority as the jurisdictional provision in the Florida Constitution requires for discretionary review in the Florida Supreme Court. Fla. Const., Art. V, § 3(b)(3). See *Jenkins* v. *State*, 385 So. 2d 1356, 1357 (Fla. 1980).

12

for this effort. I continue to believe, however, that this case does not present any legal issue warranting review in this Court.

At the time the District Court of Appeal's opinion was filed, every decision cited in the Court's opinion today had already been decided. Presumably, the petitioner called all of those cases to the attention of the Florida District Court of Appeal. Since the Court does not purport to announce any new principle of law, it is also fair to presume that the Florida District Court of Appeal was already familiar with the legal principles discussed by the Court today. Thus, the Court performs the error-correcting function that the Florida Supreme Court has refused to perform, and reverses the state court's judgment by applying settled principles to the facts of this case.

V

The Court's opinion today is flawed in at least two respects. It is highly unusual for this Court to undertake *de novo* review of the factual findings of a state court on the "articulable suspicion" issue. My colleagues did not hear the witness testify; they have insufficient time to study the transcript with the care. that is appropriate to credibility determinations; and, indeed, collectively they have only minimal experience in the factfinding profession.

Moreover, the Court's disposition of the consent issue implicitly assumes that the Florida District Court of Appeal has a duty to explain its reasons for affirming the trial court's judgment. If that court, upon remand, simply enters another one-word order affirming the trial court's judgment, I would suppose that this Court would have to interpret the ruling as a determination on the existing record that the respondent did not voluntarily consent to the search of his luggage. A petition for certiorari on that question would present "a fact-bound issue of little importance." *Massachusetts* v. *Sheppard*, 468 U. S. 981, 988, n. 5 (1984). If we presume, as I think we should, that the judges of that court

were already familiar with the cases discussed in this Court's opinion, I do not understand why we should not make the same assumption on the record as it presently exists.

## VI

There is a certain irony in the fact that respondent is a fugitive from justice. If he is apprehended, he probably will be punished for his flight from justice even if the suppression order is ultimately upheld. Perhaps this Court's tireless efforts to bring this one man to justice will result in convictions on both counts. In either event, I believe this Court should abandon its error-correcting role in cases on direct review from state courts. Instead, the Court ought to take a lesson from the Supreme Court of Florida and focus its attention on issues of overriding importance to the administration of justice. The single-minded achievement of results in individual cases is not a virtue that should characterize the work of this Court.

I respectfully dissent.