STATE OF NORTH CAROLINA v. SADI MORIS PERKEROL

No. 8410SC1042

(Filed 15 October 1985)

1. **Searches and Seizures § 13— trafficking in cocaine—airport search—drug courier profile—motion to suppress properly denied**

    The trial court did not err in a prosecution for trafficking in cocaine by denying defendant's motion to suppress evidence seized from his person and statements made by him during and after an airport investigative stop pursuant to the drug courier profile where the trial court's conclusions, supported by competent evidence, were that a reasonable person would have believed he was free to leave, defendant agreed to accompany the officers to their office voluntarily and in a spirit of cooperation, defendant freely and voluntarily consented to a search of his bag, and defendant voluntarily waived his rights, made statements to officers, and produced a bag of white powder from his pants pocket.

2. **Criminal Law § 138— trafficking in cocaine—assistance to prosecutor**

    The Court of Appeals could not determine the basis of a trial judge's statement while sentencing defendant for trafficking in cocaine that defendant

State v. Perkerol

had not complied with G.S. 90-95(h)(5) (1981) in assisting the prosecutor where the judge knew that an S.B.I. agent had approached defendant after his arrest to inquire about defendant providing substantial assistance under the statute and that defendant declined, defendant later sought unsuccessfully to suppress evidence seized and statements made, defendant indicated he was willing to provide assistance fifteen months later on the morning of the sentencing hearing but the district attorney's office declined the offer, and the assistance defendant offered included the identity and locations of individuals who met him at the airport to accept delivery of the cocaine he was carrying. This information does not support a ruling as a matter of law that defendant's offer of substantial assistance was not timely made and the matter was remanded for a new sentencing hearing.

APPEAL by defendant from the 26 April 1984 Order, denying his Motion to Suppress, of *Herring, Judge,* and the 9 July 1984 Judgment of *Brannon, Judge.* The Order and Judgment were entered in Superior Court, WAKE County. Heard in the Court of Appeals 4 April 1985.

*Attorney General Edmisten, by Assistant Attorney General Newton G. Pritchett, Jr., for the State.*

*Purser, Cheshire, Manning & Parker, by Thomas C. Manning, for defendant appellant.*

BECTON, Judge.

On 8 July 1984, the defendant, Sadi Moris Perkerol, pleaded guilty to trafficking in cocaine by possession and transportation, reserving his right, pursuant to N.C. Gen. Stat. Sec. 15A-979(b) (1983), to submit for appellate review Judge D. B. Herring, Jr.'s Order denying his motion to suppress evidence seized from his person and his motion to suppress statements made by him. Judge Anthony Brannon accepted the plea, found that defendant had not rendered "substantial assistance" to the prosecutor under N.C. Gen. Stat. Sec. 90-95(h)(5) (1981), and sentenced defendant to prison for twelve years. Considering the scope of appellate review and the record on appeal, we affirm the order denying defendant's motions to suppress. For error committed at the sentencing hearing, however, we remand.

I

[1]   This case involves one of the many hundreds of drug courier profile stops at airports in the United States during the past ten

years. As we noted in *State v. Grimmett*, 54 N.C. App. 494, 494 n. 1, 284 S.E. 2d 144, 146 (1981), *disc. rev. denied and appeal dismissed*, 305 N.C. 304, 290 S.E. 2d 706 (1982):

> "Since 1974, the federal Drug Enforcement Administration has assigned agents to certain airports as part of a nationwide program to intercept drug couriers transporting narcotics between major drug sources and distribution centers in the United States. Federal agents have developed 'drug courier profiles' describing the characteristics generally associated with narcotics traffickers, and travelers with some of those characteristics are occasionally stopped at these airports for further investigation." 3 W. LaFave, *Search & Seizure; A Treatise on the Fourth Amendment*, Sec. 9.3 (Supp. 1981).

In this case, the trial court found the following facts:

> 1. On April 13, 1983, Captain J. L. Brown of the Wake County Sheriff's Department and Special Agent Terry Turbeville of the North Carolina State Bureau of Investigation were assigned to work at the Raleigh-Durham Airport as members of a Narcotics Interdiction Unit.

> 2. As the officers were positioned at the Gregg Security Checkpoint in Terminal B to observe passengers deplane Eastern Airlines flight 594 from Atlanta, Georgia, they observed two white males in the airport lobby who appeared to be watching the officers.

> 3. The defendant entered the terminal area dressed in casual attire and carrying a shoulder bag which appeared to be almost empty. As he did so, he was met by the two men and hurried out of the airport without exchanging any greeting and without approaching the baggage claim area.

> 4. As the men exited the airport and walked by Special Agent Turbeville, he addressed the defendant, "May I speak with you a moment?" Special Agent Turbeville identified himself and Captain Brown and asked if they could see the defendant's airline ticket. The defendant then placed his shoulder bag on top of a car and unzipped it. It appeared to Agent Turbeville that the defendant was attempting to conceal the contents of the bag as he produced his airline ticket

from the bag. The ticket was an Eastern Airlines ticket from flight 594 in the name of S. Peck, with a return to Atlanta the following day. Turbeville then returned the airline ticket and asked to see another form of identification and the defendant produced a North Carolina Driver's License in the name of Sadi Perkerol. Agent Turbeville then returned the driver's license to the defendant and explained to the defendant that he and Captain Brown were Narcotics Officers and that they would like to speak with him a moment. Turbeville indicated that they had an office a short distance away and that they could step into the office to avoid any possible embarrassment. The defendant said, "Okay." Turbeville asked the defendant if he would like to get his bag and the defendant brought the bag with him to the office.

5. After the defendant, Captain Brown, and Agent Turbeville arrived at the office, Turbeville again explained that the officers were Narcotics Officers and were attempting to stem the flow of narcotics into the Raleigh-Durham area. He then asked the defendant for consent to search his person and his bag. At that point, Captain Brown, who was standing nearest the bag, asked the defendant, "May I have a look in your bag?" and the defendant replied, "Yes, go ahead." Captain Brown then unzipped the bag and found several plastic bags containing white powder. A preliminary test on the white powder conducted by the officers showed it to be cocaine.

6. The defendant was then placed under arrest and advised of his *Miranda* rights by Captain Brown, who read the rights from a standard *Miranda* rights card, and the defendant indicated that he understood those rights.

7. At no time did either Captain Brown or Agent Turbeville place their hands on the defendant. Neither officer displayed any weapons. The defendant was not handcuffed until after he was placed under arrest. Neither officer was in uniform. The officers made no promises to the defendant, nor did they threaten him in any way. The officers addressed the defendant in a conversational tone of voice. The officers did not touch the defendant's bag until the defendant agreed to the bag's being searched. The defendant never indicated to the officers that he did not wish to cooperate with them.

Defendant, of course, takes exception to most of the findings of fact and finds comfort in the United States Supreme Court's failure in three[1] "drug courier profile cases" to resolve definitively the seizure-nonseizure issues presented. The first case, *United States v. Mendenhall*, 446 U.S. 544, 64 L.Ed. 2d 497, 100 S.Ct. 1870, *rehearing denied*, 448 U.S. 908, 65 L.Ed. 2d 1138, 100 S.Ct. 3051 (1980), involved facts strikingly similar to those of the case at bar. Again, as noted in *Grimmett*, although the *Mendenhall* Court was unable to produce a majority opinion, Justice Stewart, joined by Justice Rehnquist, found no seizure because the encounter between Mendenhall and the DEA agents was consensual. In a concurring opinion, Justice Powell, joined by the Chief Justice and Justice Blackmun, declined to decide whether the stop constituted a seizure, although they did "not necessarily disagree" with Justice Stewart's view. In the second case, *Reid v. Georgia*, 448 U.S. 438, 65 L.Ed. 2d 890, 100 S.Ct. 2752 (1980), the Supreme Court, in a *per curiam* opinion, concluded that defendant's conformance to four characteristics of a drug courier profile was insufficient to establish a reasonable suspicion that they were engaged in criminal activity, but the Court refused to address the seizure issue because it had not been litigated at the trial level. In the third case, *Florida v. Royer*, 460 U.S. 491, 75 L.Ed. 2d 229, 103 S.Ct. 1319 (1983), a plurality stated that no seizure occurred when DEA agents initially approached Royer and questioned him. However, a seizure did occur when the agents identified themselves as narcotics agents, told Royer he was suspected of trans-

---

1. In what could be considered a fourth drug courier profile case—*Florida v. Rodriguez*, 469 U.S. ---, ---, 83 L.Ed. 2d 165, 171, 105 S.Ct. 308, 311 (1984), an airport drug stop case in which the majority, in a *per curiam* opinion, never mentioned the words "drug courier profile"—the Supreme Court "[a]ssum[ed], without deciding, . . . there was a 'seizure' . . . [but held] that any such seizure was justified by 'articulable suspicion'." Indeed, after noting Miami's reputation as a "source city," listing the arresting officers' training and experience in narcotics surveillance, and referring to, but not detailing, the defendants' unusual behavior, the *Rodriguez* Court said:

"Before the officers even spoke to the three confederates, one by one they had sighted the plain clothes officers and had spoken furtively to one another. One was twice overheard urging the others to 'get out of here.' Respondent's strange movements in his attempt to evade the officers aroused further justifiable suspicion, and so did the contradictory statements concerning the identities of Blanco and respondent."

*Id.* at ---, *83* L.Ed. 2d at 171, 105 S.Ct. at ---.

porting narcotics and asked him to accompany them to the police room while they retained his ticket and driver's license without indicating that he was free to go.

The Supreme Court's foray into the drug courier profile thicket has been the subject of considerable commentary. *See* J. Choper, Y. Kamisar & L. Tribe, The Supreme Court: Trends and Developments 1979-1980, at 137-39 (1981); Constantino, Cannavo & Goldstein, *Drug Courier Profiles and Airport Stops: Is the Sky the Limit?*, 3 W. New Eng. L. Rev. 175 (1980); Greenberg, *Drug Courier Profiles*, Mendenhall *and* Reid: *Analyzing Police Intrusion on Less Than Probable Cause*, 19 Am. Crim. L. Rev. 49 (1981); Greene & Wice, *The D.E.A. Drug Courier Profile: History and Analysis*, 22 S. Tex. L.J. 261 (1982); Note, *Drug Courier Profile Stops and the Fourth Amendment: Is the Supreme Court's Case of Confusion In Its Terminal Stage?*, 15 Suffolk U.L. Rev. 217 (1981); Comment, *Reformulating Seizures—Airport Drug Stops and the Fourth Amendment*, 69 Calif. L. Rev. 1486 (1981); Comment, *Drug Trafficking At Airports—The Judicial Response*, 36 U. Miami L. Rev. 91 (1981); Comment, Mendenhall *and* Reid: *The Drug Courier Profile and Investigative Stops*, 42 U. Pitt. L. Rev. 835 (1981); Comment, *Criminal Profiles After United States v. Mendenhall: How Well-Founded a Suspicion?*, 1981 Utah L. Rev. 557; Case Comment, *Fourth Amendment—Airport Searches and Seizures: Where Will the Court Land?*, 71 J. Crim. Law & Criminology 499 (1980); Case Comment, *Search and Seizure—Airport Drug Seizures: How the Federal Courts Strike the Fourth Amendment Balance*, 58 Notre Dame L. Rev. 668 (1983); Case Comment, *Criminal Law: Drug Courier Profiles, United States v. Mendenhall*, 5 Nova L.J. 141 (1980).

Many of the commentators have been critical of the Supreme Court's analysis in drug courier cases. It is not surprising, then, that the approach taken most often by courts that have wrestled with the problem is based on *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed. 2d 889, 88 S.Ct. 1868 (1968) which created a limited exception to the general rule that seizures of a person require probable cause. That approach, adopted by our Supreme Court in *State v. Thompson*, 296 N.C. 703, 706, 252 S.E. 2d 776, 779 (1979), "requires only that the officer have a 'reasonable' or 'founded' suspicion as justification for a limited investigative seizure." And, although *Thompson* is not a drug courier profile case, this Court, in the

drug courier profile context, following both *Terry* and its progeny and our Supreme Court's statement in *Thompson*, adopted a three-tiered standard by which to balance the need to investigate possible criminal activity against the intrusion of individual freedom in police-citizen encounters:

> 1. Communications between police and citizens involving no coercion or detention are outside the scope of the fourth amendment;

> 2. Brief seizures must be supported by reasonable suspicion; and

> 3. Full-scale arrests must be supported by probable cause.

*State v. Harrell*, 67 N.C. App. 57, 312 S.E. 2d 230 (1984); *State v. Sugg*, 61 N.C. App. 106, 300 S.E. 2d 248, *disc. rev. denied*, 308 N.C. 390, 302 S.E. 2d 257 (1983); *State v. Grimmett; see United States v. Berry*, 670 F. 2d 583 (5th Cir. 1982).

With the foregoing as a backdrop, and especially considering this Court's pronouncements in *Harrell, Sugg*, and *Grimmett* and our scope of review, we reject defendant's alternative contentions (1) that the initial encounter constituted a seizure that was unsupported by specific and articulable facts or reasonable suspicion that defendant was engaged in criminal activity, and (2) that defendant was seized when the officers requested that he accompany them to the office after they had discovered additional facts from their initial questioning. The following conclusions of law by the trial court, which we find to be based on competent evidence, are binding on us and foreclose relief to defendant.

> 2. The conduct of Special Agent Turbeville and Captain Brown in approaching the defendant and requesting to see his airline ticket and driver's license constituted a Constitutionally permissible investigative stop. The totality of the circumstances and all of the credible evidence point to the conclusion that the defendant was not seized within the meaning of the Fourth Amendment and that a reasonable person would have believed he was free to leave.

> 3. The defendant agreed to accompany the officers to their office voluntarily and in a spirit of apparent cooperation. The officers' request that the defendant accompany

them to the office did not transform the initial Constitutionally permissible encounter into a seizure.

4. The defendant freely and voluntarily gave the officers his consent to search the bag without the officers' having made any threats, either express or implied.

5. The defendant was properly advised of his *Miranda* rights by the officers both at the airport office and at the Wake County Sheriff's Department. He freely, voluntarily, and knowingly waived those rights and made statements to the law enforcement officers without any duress, coercion, or inducement by the officers.

6. After having been arrested and before being taken to the jail, the defendant voluntarily produced the bag of white powder from his pants pocket.

These conclusions of law likewise prompt us to reject defendant's argument that he did not consent to the search of his bag. *See State v. Grimmett; cf. State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983) (findings supported the trial court's conclusion that defendant voluntarily, willingly and understandingly consented to a search of his bedroom, notwithstanding defendant presented evidence that he was 17 years old at the time of the search, that he had an I.Q. of only 50 to 65, that he suffered from a schizophreniform disorder, that he was more susceptible to fear and intimidation than an average person, that ten police officers were present when he was arrested, and that officers told him that if he refused to sign the form, a warrant would be obtained and "Either way, we are going to search the apartment").

II

[2] N.C. Gen. Stat. Sec. 90-95(h)(5) (1981) provides, in pertinent part, that:

[T]he sentencing judge *may* reduce the fine, or impose a prison term less than the applicable minimum prison term provided by this subsection, or suspend the prison term imposed and place a person on probation when such person has, to the best of his knowledge, provided substantial assistance in the identification, arrest, or conviction of any accomplices, accessories, coconspirators, or principals if the sentencing

judge enters in the record a finding that the person to be sentenced has rendered such substantial assistance. (Emphasis added.)

On Perkerol's Judgment and Commitment form, the sentencing judge stated: "The defendant has not complied with the section of the Statute dealing with assistance to the prosecutor." Defendant asserts that the sentencing judge erroneously concluded "as a matter of law that the defendant's offer of substantial assistance pursuant to N.C.G.S. Sec. 90-95(h)(5), made at the time he entered his plea of guilty, was not timely made." On the other hand, the State asserts that the sentencing judge did not focus on the timeliness of the information defendant sought to provide but rather, found "that the defendant had not rendered substantial assistance . . . ." The differing interpretations of the sentencing judge's statement prompts a remand for resentencing because we cannot determine upon what basis the sentencing judge acted.

Before sentencing defendant, the judge knew (1) that following defendant's arrest, Special Agent Turbeville approached defense counsel to inquire about the defendant's providing substantial assistance under the statute and that defendant initially declined; (2) that defendant later sought, unsuccessfully, to suppress evidence seized and statements made; (3) that some fifteen months later, on the morning of the sentencing hearing, defendant indicated he was willing to provide assistance, but the district attorney's office declined the defendant's offer; and (4) that the assistance defendant offered included the identity and locations of the individuals who met him at the airport on 13 April 1983 to accept the delivery of the cocaine he was carrying. In our view, this information does not support a ruling, as a matter of law, that defendant's offer of substantial assistance was not timely made. First, the statutory language "has rendered such substantial assistance" commonsensically sets no time limit on when such assistance must be rendered. After all, defendants charged with drug offenses often seek to suppress evidence and avoid convictions before implicating themselves and others.[2] Sec-

2. Compare the Florida statute, which provides that "[t]he State attorney may move the sentencing court to reduce or suspend the sentence of any person who is convicted . . . and who provides substantial assistance . . . ." Fla. Stat. Annot. Sec. 893.135 (1985 Supp.). A Florida District Court of Appeals interpreted this statute as offering "its inducement to the defendant at a time when he has already

ond, in enacting G.S. § 90-95, our legislature recognized that a system of mandatory prison terms coupled with harsh fines is not enough to deter drug traffickers. In *State v. Baldwin*, 66 N.C. App. 156, 159, 310 S.E. 2d 780, 782, *aff'd*, 310 N.C. 623, 313 S.E. 2d 159 (1984), we said:

> Trafficking relies on complex, interwoven networks. A principal in one network may be an accomplice in another. To effectively combat trafficking, police authorities need information on, and access to, the myriad of drug-dealing activities in the various networks. Built into the trafficking statutes is a *bargaining tool*, G.S. Sec. 90-95(h)(5), a provision exchanging potential leniency for assistance from those who have easy access to drug networks.

Realizing that G.S. § 90-95(h)(5) does not make the State's acceptance of a defendant's offer a prerequisite to finding substantial assistance and that the statute includes the specific language, "when such person has, to the best of his knowledge, provided substantial assistance," we remand so the sentencing judge can determine if defendant provided "substantial assistance" in accordance with the statute. We recognize, of course, that the statute is permissive, not mandatory, and that defendant has no right to a lesser sentence even if he does provide what he believes to be substantial assistance.

For the foregoing reasons, the order denying defendant's motion to suppress is affirmed; the judgment imposing a twelve-year sentence is vacated, and the matter is remanded for a new sentencing hearing.

Affirmed in part and remanded.

Judges WEBB and PARKER concur.

---

been adjudicated guilty, either on a plea of guilty or on a verdict . . . ." *Stehling v. State*, 391 So. 2d 287, 288 (Fla. App. 1981). Moreover, in *State v. Willis*, 61 N.C. App. 23, 41, 300 S.E. 2d 420, 430-31, *modified and aff'd*, 309 N.C. 451, 306 S.E. 2d 779 (1983), this Court, quoting another Florida case, *State v. Benitez*, 395 So. 2d 514, 518-19 (Fla. 1981), likened what is now G.S. Sec. 90-95(h)(5) to a "post-conviction form of plea bargaining."