STATE OF NORTH CAROLINA v. JOHN RALPH THOMAS

No. 8518SC1128

(Filed 3 June 1986)

**1. Criminal Law § 75.1— incriminating statements—no coercion**
    The trial court properly denied defendant's motion to suppress incriminating statements made by him to SBI agents inside their private office where the agents approached defendant at the baggage claim area of an airport and requested to see his ticket and driver's license; these items were returned and defendant was told that the agents were conducting an investigation and they would appreciate his cooperation; the agents asked defendant to accompany them down the concourse to their office so they could explain further what they were trying to do; defendant acquiesced without comment; and the agents at no time used any force or coercion.

**2. Searches and Seizures § 8— warrantless arrest—probable cause—search of luggage lawful**
    There was no merit to defendant's contention that SBI agents lacked probable cause to arrest him and thus could not lawfully search his luggage

where the agents enumerated behavior of defendant which they contended was characteristic of persons trafficking in narcotics; in response to the agents' questions, defendant told them that he might have something on him which he shouldn't have; and defendant asked the agents if they wanted him to show it to them.

**3. Searches and Seizures § 8— warrantless arrest—warrantless search of luggage improper**

SBI agents could not lawfully search defendant's suitcase without a warrant as a search incident to a lawful arrest, since the suitcase was locked, extremely large and cumbersome; the unnamed defendant was in the private office of two SBI agents, one of whom was armed; two additional law enforcement officers were outside the small private office; and the suitcase was thus effectively reduced to the agents' exclusive control.

APPEAL by defendant from 26 June 1985 order of *Davis, Judge,* and 12 June 1985 judgment of *Beaty, Judge,* entered in Superior Court, GUILFORD County. Heard in the Court of Appeals 13 February 1986.

On 12 June 1985 defendant pled guilty to possession of marijuana, a schedule VI controlled substance (N.C. Gen. Stat. 90-94), with the intent to sell and deliver. N.C. Gen. Stat. 90-95(a)(1). Pursuant to N.C. Gen. Stat. 15A-979(b), which provides that the denial of a motion to suppress evidence may be reviewed upon an appeal from a judgment entered upon a plea of guilty, defendant appeals the denial of his motion to suppress statements he made and evidence seized from his person.

*Attorney General Thornburg, by Assistant Attorney General Thomas D. Zweigart, for the State.*

*Cofer and Mitchell, by William L. Cofer, for defendant appellant.*

WHICHARD, Judge.

For reasons set forth below, we hold that the court properly denied the motion to suppress defendant's incriminating statements, but erred in denying his motion to suppress the physical evidence agents obtained when they searched his luggage without a warrant. Accordingly, the order denying defendant's motion to suppress is affirmed in part and reversed in part, and the judgment entered upon defendant's plea of guilty is vacated.

## I.

Terry Turbeville and Steven G. Porter, narcotics agents for the North Carolina Bureau of Investigation (S.B.I.), were the only witnesses to testify at the suppression hearing. From their uncontradicted testimony the following facts can be adduced:

On the morning of 23 January 1985 defendant arrived at Greensboro Regional Airport aboard a regularly scheduled commercial flight. As he deplaned, defendant "made eye contact with" Turbeville, who was working with Porter and two other officers on a drug interdiction assignment. Turbeville recalled having seen defendant in the Greensboro terminal a day or two earlier wearing a leather jacket, jeans and boots. He further described defendant's appearance on that prior occasion as "rather unkempt." Defendant was now wearing a three-piece suit which "didn't fit him very well" and what appeared to be the same "unkempt boots."

The four members of the interdiction team, none of whom wore a uniform, followed defendant as he proceeded across the terminal and down an escalator toward the baggage claim area. Turbeville and Porter followed directly, while the two other officers followed at a distance. Twice defendant looked back at Turbeville and Porter.

Once inside the baggage claim area defendant positioned himself against a wall at the far end of the baggage conveyor belt, twenty to twenty-five feet from the other passengers. While waiting for his baggage, defendant "watch[ed] the people around him." He would repeatedly focus on Turbeville and Porter and then look away. After most of the passengers had claimed their luggage, defendant walked over to the conveyor belt, picked up a large American Tourister suitcase, and turned to walk out of the terminal. The suitcase was "obviously very heavy and cumbersome."

Turbeville and Porter approached defendant. Turbeville identified himself and Porter as S.B.I. agents and they both showed defendant their credentials. Turbeville asked to see defendant's airline ticket; defendant complied with the request. The ticket indicated that it had been purchased with cash, that the passenger's name was Mike Dees, and that he had flown from Greensboro,

North Carolina to Houston, Texas the day before. After both agents noted the above information, Turbeville returned the ticket to defendant.

Addressing defendant as "Mr. Dees," Turbeville inquired whether he had seen defendant in the terminal in the last day or two. Defendant replied, "No, I don't think so." Again addressing defendant as "Mr. Dees," Turbeville asked whether defendant had "further identification." Defendant produced a driver's license which bore the name Ralph Thomas and explained that a friend had made his travel reservation. Turbeville returned defendant's license. Turbeville testified that throughout the initial contact with defendant "he was very nervous, both in his manner of speech and in his not being able to move around too much without his hands shaking."

After returning defendant's license Turbeville explained to defendant that he and Porter were conducting a narcotics investigation and that they would appreciate his cooperation. He told defendant that they had an office down the concourse "aways" and asked if defendant would accompany them to that office so they "could explain further what it was [they] were trying to do" and so they could avoid causing him "any embarrassment by talking with him in the middle of the terminal."

Defendant acquiesced without commenting. Defendant carried the large suitcase which he had just claimed and Turbeville carried defendant's carry-on luggage, a blue nylon bag. Porter accompanied defendant and Turbeville to the office. The two other officers followed at a distance but remained outside the office.

Once inside the office Turbeville again told defendant that he and Porter were conducting a narcotics investigation. He further explained that they were "not trying to find everybody's small amount of marijuana they had for personal use," but what they "were looking for was large amounts of narcotics coming into the area." The following dialogue then took place:

Agent Turbeville: "Do you have anything on you that you shouldn't have?"

Defendant: "Yes, [pause] I might have."

Agent Turbeville: "Well, why don't we go ahead and take care of that right now."

Defendant: "Well, what do you want me to do, show it to you?"

Agent Turbeville: "Well, yes."

Defendant: "I'm not sure I understand what my rights are."

Turbeville asked defendant to consent to a search of his person and his luggage. He explained that defendant had the right to refuse consent. Defendant chose to exercise that right and refused to consent to a search. Turbeville then placed defendant under arrest for "[p]ossession of controlled substances." After arresting defendant, Turbeville and Porter conducted a search of his person and luggage. The large American Tourister suitcase was locked and upon request defendant supplied the key. The suitcase contained twenty-five one pound packages of marijuana.

Based on the foregoing facts, the court concluded as a matter of law:

[1.] that Agent Turbeville had reasonable and articulable suspicion that the defendant had committed a felony;

[2.] that Agent Turbeville had reasonable grounds to stop the defendant and to arrest the defendant;

[3.] that the arrest of the defendant was, in all respects, lawful and valid; [and]

[4.] that the search of the person of the defendant and his two bags was, in all respects, reasonable, incident to a valid arrest.

Accordingly, the court denied defendant's motion to suppress.

## II.

**[1]** Defendant contends the court erred in denying his motion to suppress the incriminating statements he made to Turbeville and Porter once inside the private office and the marijuana the agents seized following his arrest. He argues that this evidence was obtained in violation of his Fourth Amendment rights and therefore should have been excluded. In particular defendant maintains (1) that he was unlawfully seized when Turbeville and Porter escorted him from the public area of the airport terminal to a private office without having "reasonable suspicion" of his in-

State v. Thomas

volvement in criminal activity; (2) that he was arrested without probable cause; and (3) that Turbeville and Porter could not lawfully search his luggage following his arrest without first obtaining a search warrant.

On several occasions this Court has examined the Fourth Amendment implications raised by facts similar to those here. *State v. Perkerol,* 77 N.C. App. 292, 335 S.E. 2d 60 (1985), *disc. rev. denied,* 315 N.C. 595, 341 S.E. 2d 36 (1986); *State v. White,* 77 N.C. App. 45, 334 S.E. 2d 786, *disc. rev. denied,* 315 N.C. 189, 337 S.E. 2d 864 (1985); *State v. Sugg,* 61 N.C. App. 106, 300 S.E. 2d 248, *disc. rev. denied,* 308 N.C. 390, 302 S.E. 2d 257 (1983); *State v. Casey,* 59 N.C. App. 99, 296 S.E. 2d 473 (1982); *State v. Grimmett,* 54 N.C. App. 494, 284 S.E. 2d 144, *disc. rev. denied,* 305 N.C. 304, 290 S.E. 2d 706 (1982); *State v. Cooke,* 54 N.C. App. 33, 282 S.E. 2d 800 (1981), *aff'd,* 306 N.C. 132, 291 S.E. 2d 618 (1982). To a large extent leading United States Supreme Court decisions have guided this Court on the lawfulness of a law enforcement officer's questioning and/or search or seizure of an air traveler based on the belief that the traveler is engaged in criminal activity. *Florida v. Rodriquez,* 469 U.S. 1, 83 L.Ed. 2d 165, 105 S.Ct. 308 (1984); *Florida v. Royer,* 460 U.S. 491, 75 L.Ed. 2d 229, 103 S.Ct. 1319 (1983); *Reid v. Georgia,* 448 U.S. 438, 65 L.Ed. 2d 890, 100 S.Ct. 2752 (1980); *United States v. Mendenhall,* 446 U.S. 544, 64 L.Ed. 2d 497, 100 S.Ct. 1870 (1980). The analysis which has emerged from these decisions can be summarized as follows:

"1. Communications between police and citizens involving no coercion or detention are outside the scope of the fourth amendment;

2. Brief seizures must be supported by reasonable suspicion; and

3. Full-scale arrests must be supported by probable cause."

*Perkerol,* 77 N.C. App. at 298, 335 S.E. 2d at 64. *See also Sugg,* 61 N.C. App. at 108-09, 300 S.E. 2d at 250.

Defendant concedes that his Fourth Amendment rights were not implicated when Turbeville and Porter approached him in the baggage claim area and asked to see his airline ticket and further identification. *Rodriquez,* 469 U.S. at 5-6, 83 L.Ed. 2d at 170-71, 105 S.Ct. at 310-11; *Mendenhall,* 446 U.S. at 553-55, 64 L.Ed. 2d at

509-10, 100 S.Ct. at 1877-78; *see Casey*, 59 N.C. App. at 105, 296 S.E. 2d at 477; *Grimmett*, 54 N.C. App. at 498, 284 S.E. 2d at 148. He maintains, however, that he was unlawfully seized when the agents escorted him from the public area of the airport terminal to the private office.

Relying on *Mendenhall, supra,* and *White, supra,* the State maintains that defendant was not unlawfully seized when escorted by the agents to a private office because defendant voluntarily consented to accompany them. We agree.

In *Mendenhall* two Drug Enforcement Administration (DEA) agents working in the Detroit Metropolitan Airport approached respondent, an air traveler who had just arrived aboard a commercial flight from Los Angeles, because her conduct "appeared to the agents to be characteristic of persons unlawfully carrying narcotics." 446 U.S. at 547-48, 64 L.Ed. 2d at 505, 103 S.Ct. at 1873. Respondent complied with one agent's request to see her airline ticket and her driver's license. The agent returned respondent's ticket and license and asked her to accompany the agents to the DEA office, which was up a flight of stairs and approximately fifty feet from where the agents had first approached her. 446 U.S. at 547-48, 64 L.Ed. 2d at 505, 103 S.Ct. at 1873-74. The court stated that "[t]he question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances, . . . and is a matter which the Government has the burden of proving. [Citations omitted.]" 446 U.S. at 557, 64 L.Ed. 2d at 511, 103 S.Ct. at 1879. Emphasizing "that the respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers," that "[t]here were neither threats nor any show of force," that "[t]he respondent had been questioned only briefly, and [that] her ticket and identification were returned to her before she was asked to accompany the officers," the Court found the "totality of the evidence . . . plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office." 446 U.S. at 557-58, 64 L.Ed. 2d at 512, 103 S.Ct. at 1879. *Cf. Royer*, 460 U.S. at 501, 75 L.Ed. 2d at 239, 103 S.Ct. at 1326 ("[W]hen the officers identified themselves as narcotics agents, told Royer he was suspected of transporting narcotics, and asked him to accompany them to the police room

while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.").

In *White* and *Grimmett, supra,* this Court, faced with facts almost identical to those in *Mendenhall,* found the evidence sufficient to support a determination that defendants voluntarily accompanied narcotics agents to private offices within airports. We cannot distinguish the facts here from those in *Mendenhall, White,* and *Grimmett.* Before requesting that defendant accompany them to the private office, Turbeville and Porter had only briefly questioned defendant and had returned his ticket and license. The court specifically found that "defendant, without any force or coercion on the part of the officer, went with Agent Turbeville and Agent Porter . . . and he was not commanded to go with the officers." The court thus properly denied defendant's motion to suppress the incriminating statements he made shortly after entering the private office.

## III.

[2] Defendant next contends the agents lacked probable cause to arrest him and thus could not lawfully search his luggage. "Probable cause exists when the facts and circumstances known to the arresting officer at the time of arrest were sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense." *State v. Gray,* 55 N.C. App. 568, 570, 286 S.E. 2d 357, 359 (1982). "The existence of probable cause so as to justify an arrest without a warrant 'is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in light of the particular circumstances and the particular offense involved.'" *State v. Phillips,* 300 N.C. 678, 684, 268 S.E. 2d 452, 456 (1980), *quoting* 5 Am. Jur. 2d, Arrest Sec. 48.

At the suppression hearing Porter enumerated "ten articulable facts" which led him and Turbeville to believe they had probable cause to arrest defendant:

(1) Defendant arrived from Houston, Texas, a city identified by a "Federal [Narcotics] Task Force" as a source city for marijuana distribution.

(2) Shortly after deplaning defendant made "distinct eye contact" with Turbeville.

(3) Turbeville had seen defendant in the airport a day or two earlier wearing "work clothes."

(4) As Turbeville and Porter followed defendant up the concourse, "he made an abrupt turn" and looked back at them. A similar incident occurred on the escalator.

(5) Once inside the baggage claim area defendant positioned himself twenty to twenty-five feet away from the other passengers. "He . . . began scanning the area. He would repeatedly focus . . . on Agent Turbeville and [Agent Porter], look away, and then look back." Defendant did not readily claim his luggage.

(6) Defendant paid for his ticket in cash.

(7) Defendant had flown from Greensboro to Houston the day before. The amount of luggage defendant carried — a carry-on bag and "an extremely large suitcase" — was disproportionate to the length of his stay. In addition, according to Porter, defendant's "American Tourister hard-shell type luggage" is often used to transport narcotics.

(8) When asked by Turbeville, "Did I see you in the airport in the last day or two," defendant responded, "No." Defendant's response was inconsistent with the fact that Turbeville had observed him in the airport terminal the day before.

(9) Defendant was travelling under an assumed name. Twice defendant acknowledged Turbeville's use of the name which appeared on the airline ticket. It was not until Turbeville asked to see defendant's driver's license that defendant explained that a friend had made the reservation and "Mike Dees" was not his name.

(10) After Turbeville explained that he and Porter were "looking for large amounts of narcotics coming into the area," Turbeville asked if defendant had anything on him he shouldn't have and defendant responded, "Yes, [pause] I might have." Turbeville asked defendant if they could "go ahead and take care of that right now," and defendant responded, "Well, what do you want me to do, show it to you?" Porter interpreted defendant's

statement as an admission: "He as much as told Agent Turbeville that he had narcotics on him."

Porter's particularization of defendant's conduct includes acts from which it would often be difficult to draw inferences of criminality. Using cash to purchase an airline ticket, carrying American Tourister luggage, and making short trips clearly can be the acts of an innocent traveler. According to Porter, however, such conduct is characteristic of persons trafficking in narcotics. The interception of narcotics traffickers as they move narcotics from "source cities" to points of distribution is "a highly specialized law enforcement operation designed to combat the serious societal threat posed by narcotics distribution." *Mendenhall,* 446 U.S. at 562, 64 L.Ed. 2d at 515, 103 S.Ct. at 1881 (Powell, J., concurring). Turbeville and Porter were well-trained in narcotics law enforcement. While "the fact that certain characteristics [are] claimed to be part of a drug courier profile in no way enhances the 'quantum of individualized suspicion' usually a prerequisite to a constitutional search and seizure," *Casey,* 59 N.C. App. at 111, 296 S.E. 2d at 481, *quoting United States v. Martinez-Fuerte,* 428 U.S. 543, 560, 49 L.Ed. 2d 1116, 1130, 96 S.Ct. 3074, 3084 (1976), trained law enforcement officers are " 'entitled to assess the facts in light of [their] experience.' " *Mendenhall,* 446 U.S. at 564, 64 L.Ed. 2d at 515, 103 S.Ct. at 1882 (Powell, J., concurring) *quoting United States v. Brignoni-Ponce,* 422 U.S. 873, 885, 45 L.Ed. 2d 607, 619, 95 S.Ct. 2574, 2582.

We find the totality of the facts and circumstances known to Turbeville and Porter "sufficient to warrant a prudent man in believing that defendant was in possession of a controlled substance" and thus sufficient to establish probable cause to arrest. *Gray, supra.* In so finding, we rely heavily on the incriminating statements defendant made shortly after entering the private office. *See Grimmett,* 54 N.C. App. at 504, 284 S.E. 2d at 151. The court thus properly rejected defendant's contention that the agents could not lawfully search his luggage because they lacked probable cause to arrest him.

IV.

[3]  Defendant next contends the warrantless search of his luggage was in violation of the Fourth Amendment. We agree.

The Fourth Amendment requires that searches of private property be performed pursuant to a search warrant issued in compliance with the Warrant Clause whenever reasonably practicable. *Chimel v. California*, 395 U.S. 752, 758, 23 L.Ed. 2d 685, 691, 89 S.Ct. 2034, 2037 (1969). The United States Supreme Court has consistently held that "searches made without a valid search warrant are presumptively unreasonable unless the search falls within one of the well-recognized exceptions to the [warrant requirement]." *Cooke*, 54 N.C. App. at 38, 282 S.E. 2d at 804, *citing Stoner v. California*, 376 U.S. 483, 11 L.Ed. 2d 856, 84 S.Ct. 889 (1964). Exceptions to the search warrant requirement are "jealously and carefully drawn," *Jones v. United States*, 357 U.S. 493, 499, 2 L.Ed. 2d 1514, 1519, 78 S.Ct. 1253, 1257 (1958), and " 'the burden is on those seeking [an] exemption . . . to show the need for it . . . .' " *Chimel*, 395 at 762, 23 L.Ed. 2d at 693, 89 S.Ct. at 2039, *quoting United States v. Jeffers*, 342 U.S. 48, 51, 96 L.Ed. 59, 64, 72 S.Ct. 93, 95 (1951); *see also Mincey v. Arizona*, 437 U.S. 385, 390-91, 57 L.Ed. 2d 290, 299, 98 S.Ct. 2408, 2412 (1978).

The State relies on the court's conclusion that the search of defendant's luggage was proper as within the "search incident to arrest" exception to the warrant requirement. An officer may, incident to a lawful arrest, conduct a warrantless search of the arrestee's person and the area within the arrestee's immediate control. *Chimel, supra.* Such warrantless searches are justified by the need for police safety and the preservation of evidence. *Chimel*, 395 U.S. at 762-63, 23 L.Ed. 2d at 694, 89 S.Ct. at 2040. As "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation,' " *Mincey*, 437 U.S. at 393, 57 L.Ed. 2d at 300, 98 S.Ct. at 2413, *quoting Terry v. Ohio*, 392 U.S. 1, 25-26, 20 L.Ed. 2d 889, 908, 88 S.Ct. 1868, 1882 (1968), the scope of a search incident to arrest is limited to "the area from within which [an arrestee] might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 23 L.Ed. 2d at 694, 89 S.Ct. at 2040. Thus, in essence the State contends that the search of defendant's luggage following his lawful arrest was proper because the luggage may have contained contraband that the defendant could destroy or weapons that he could use against the arresting agents. As applied to defendant's locked, "extremely large," "cumbersome" suitcase, the State's contention is implausible and contrary to the case law.

In *United States v. Chadwick*, 433 U.S. 1, 53 L.Ed. 2d 538, 97 S.Ct. 2476 (1976), at the time of their arrest respondents were in possession of a double-locked footlocker. In considering the constitutionality of a warrantless search of the footlocker by federal agents more than an hour after they had gained exclusive control of it, the Court stated:

> [W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest," *Preston v. United States*, 376 U.S. at 367, or *no exigency exists*. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest. [Emphasis supplied.]

*Chadwick*, 433 U.S. at 15, 53 L.Ed. 2d at 550-51, 97 S.Ct. at 2485. While Turbeville's search of defendant's luggage was less " 'remote in time or place from the arrest' " than the search held unconstitutional in *Chadwick*, as in *Chadwick* there were no exigent circumstances to justify the search. The large suitcase which defendant carried into the private office was not, at the time of defendant's arrest, "immediately associated" with defendant's person. A properly conducted search of defendant's person following his arrest revealed that defendant was unarmed. Turbeville had ascertained that the large suitcase was locked and had obtained the key. Defendant was in the immediate custody of two S.B.I. agents, at least one of whom was armed. Two additional law enforcement officers were outside the small private office. Defendant could not have reached the contents of the locked suitcase. The suitcase was effectively reduced to the agents' exclusive control and, as a result, the agents could not lawfully search it without first obtaining a warrant. *Chadwick, supra; see,* Note, 6 Am. J. Crim. Law 81, 94 (1978).

Arguably, *New York v. Belton*, 453 U.S. 454, 69 L.Ed. 2d 768, 101 S.Ct. 2860 (1981), lays the foundation for a different result. In *Belton* the Court abandoned use of the *Chimel* subjective inquiry to determine the proper scope of a search incident to arrest when

the arrestee is an occupant of a motor vehicle. 453 U.S. at 460, 69 L.Ed. 2d at 775, 101 S.Ct. at 2864. The court forged an objective "bright-line" rule that allows police officers incident to the arrest of an occupant of a motor vehicle, to "examine the contents of any containers found within the [vehicle's] passenger compartment . . . ." *Id.* The Court, however, expressly stated: "Our holding . . . does no more than determine the meaning of *Chimel's* principles *in this particular and problematic context.* It in no way alters the fundamental principles established in the *Chimel* case regarding the basic scope of searches incident to . . . arrests." [Emphasis supplied.] *Id.* at n. 3. In his dissenting opinion, Justice Brennan laments:

> By approving the constitutionality of the warrantless search in this case, the Court carves out a dangerous precedent that is not justified by the concerns underlying *Chimel.* Disregarding the principle "that the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement," . . . the Court for the first time grants police officers authority to conduct a warrantless "area" search under circumstances where there is no chance that the arrestee "might gain possession of a weapon or destructible evidence." . . . Under the approach taken today, the result would presumably be the same even if Officer Nicot had handcuffed Belton and his companions in the patrol car before placing them under arrest, and even if his search had extended to locked luggage or other inaccessible containers located in the back seat of the car. [Citations omitted.]

453 U.S. at 468, 69 L.Ed. 2d at 780, 101 S.Ct. at 2868.

We decline to extend the "bright-line" *Belton* approach to arrests outside the automobile context. Based in part on the automobile's inherent mobility, its occupants' expectation of privacy is diminished and, as a result, warrantless searches of automobiles are permitted "in circumstances in which [they] would not be reasonable in other contexts." *Chadwick,* 433 U.S. at 12, 53 L.Ed. 2d at 549, 97 S.Ct. at 2484. *Cf. State v. Isleib,* 80 N.C. App. 599, 343 S.E. 2d 234 (1986). However, "[u]nlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. . . . [A] person's expectations of

privacy in personal luggage are substantially greater than in an automobile." *Chadwick*, 433 U.S. at 13, 53 L.Ed. 2d at 549, 97 S.Ct. at 2484. The *Belton* approach thus is properly confined to the automobile context and does not extend to personal luggage situated outside that context.

Insofar as the order denies defendant's motion to suppress his incriminating statements, it is affirmed. Insofar as it denies defendant's motion to suppress the physical evidence obtained when agents searched his luggage without a warrant following his arrest, it is reversed. Because the court erred in denying defendant's motion to suppress the physical evidence seized, the judgment entered upon defendant's plea of guilty is vacated.

Order affirmed in part, reversed in part; judgment vacated.

Judges WELLS and COZORT concur.