STATE OF NORTH CAROLINA v. MICHAEL RAY McDANIELS, Defendant/
Appellant

No. 9010SC993

(Filed 18 June 1991)

1. **Searches and Seizures § 12 (NCI3d) — narcotics — stop of car at airport — reasonable suspicion**

     The trial court in a cocaine prosecution correctly denied defendant's motion to suppress, which was based on the issue of reasonable suspicion to make an investigatory stop, where SBI agents received information that an air charter agent suspected drug smuggling activity; defendant and another man, using the names "Mr. Smith" and "Mr. Jones" without first names, had arranged to charter a plane to fly late at night to a location in New Jersey a short distance from New York City; the officers knew that the New York City area is the source of about ninety percent of the drugs brought into central North Carolina; the two men had made an identical trip the weekend before from RDU using a different charter service which had no planes available on this occasion; the two were dressed in "shiny," "silky," "flashy" business suits; they took off around 6:30 p.m. and landed back in North Carolina about 1:30 a.m. on Sunday; they paid in cash for their flight, which is common for drug couriers while businessmen usually pay by business check or credit card; the two men gave the charter service two telephone numbers, one of which was disconnected and the other did not show a separate listing for a Smith or Jones; the car in which they were riding, which had heavily tinted glass, circled the parking lot when it arrived, drove away, then returned five or ten minutes later; a check on the car while the men were on their flight revealed that the license plate was in the name of a Durham woman and was assigned to a different car; the vehicle identification number was registered to an owner named neither Smith nor Jones in another part of the state; and, while defendant carried a briefcase, late Saturday night seemed to the agents an unusual time to conduct business.

**Am Jur 2d, Searches and Seizures §§ 41-43.**

2. **Searches and Seizures § 12 (NCI3d) — narcotics — stop of car at airport late at night — constitutional**

A stop of a car containing suspected drug couriers late at night at an airport was supported by a reasonable suspicion and was constitutional where there was reasonable suspicion that the occupants of the car had chartered an aircraft to fly to the New York area for narcotics; the charter service owner feared retaliation if his business was suspected of being the informer and requested that the stop be made away from his hangar; the charter service parking area had no lights and adjoined a number of alleyways; there is no screening for weapons on private flights; the chief SBI agent was concerned about the safety of a confrontation at that location; the officers were also concerned about the safety of a high speed chase at the airport or on the highway; the suspects were stopped a short distance from the charter service; the duration of the investigative stop was "probably not two minutes" up to the time the officers received consent to search the car; the officers confirmed their suspicions that the suspects had purchased tickets for their charter flight under assumed names; the total time from stop to arrest was ten to fifteen minutes by one estimate and twenty-five to thirty by another; only the main agent approached the driver's side of the car; the blue lights on the vehicles used to make the stop were turned off; a second officer approached the passenger side of the car, where this defendant was sitting; the officers spoke in a calm, normal voice with a nonthreatening tone; the suspects were never surrounded; the only weapon visible was that of a state trooper; no weapon was drawn; and no force was used to get the occupants to step out of the car. Even if the officers seized defendant for Fourth Amendment purposes, a seizure is not per se an arrest.

**Am Jur 2d, Searches and Seizures §§ 41-43.**

3. **Searches and Seizures § 11 (NCI3d) — narcotics — search of vehicle — valid**

A motion to suppress in a cocaine trafficking prosecution, based in part on the alleged invalidity of the consent to a search of a car, was properly denied because defendant had no expectation of privacy in the car in which he was a passenger because he was not in apparent control of the car. Moreover,

STATE v. McDANIELS

[103 N.C. App. 175 (1991)]

defendant never objected to the driver's consent at the scene and never asserted ownership rights in either the car or any of its contents; even if defendant had ownership rights in the contents of the car, failure to speak and assert the personal right of immunity from unreasonable search and seizure amounts to a voluntary consent when that person knows the driver has given his verbal consent to search. The facts surrounding the consent demonstrate no coercion by the police, implied or otherwise, and the consent was effective to bestow permission to search under N.C.G.S. § 15A-222(2) and N.C.G.S. § 15A-221(a). Although the officers had reason to believe that the driver was probably not the registered owner, the driver's words of consent were sufficient to justify the agent's continuing assumption that the driver was lawfully in control of the car and nothing in the record suggests that the driver's consent was limited in scope, including any objection to the use of a dog to continue searching the car.

**Am Jur 2d, Searches and Seizures §§ 49, 53, 96.**

4. **Searches and Seizures § 11 (NCI3d) — narcotics — search of briefcase inside vehicle — valid**

There was no Fourth Amendment violation in the SBI's handling of a briefcase during its investigation of the inside of a car where an agent searching the car picked up a briefcase on the back floorboard and asked the driver and then defendant if it belonged to either, defendant told the agent that the case belonged to his cousin and that he did not think the police should search the briefcase without a warrant, the agent placed the briefcase on the backseat unopened, a dog later alerted to the briefcase, a warrant was obtained, and cocaine was found inside. If defendant had a privacy interest, it was limited to the contents of the briefcase, which were not examined until after the agents procured a search warrant.

**Am Jur 2d, Searches and Seizures §§ 96, 97, 99.**

**Use of trained dog to detect narcotics as unreasonable search in violation of Fourth Amendment. 31 ALR Fed 931.**

5. **Searches and Seizures § 23 (NCI3d) — narcotics — search warrant — probable cause — trained drug dog**

There was probable cause to issue a warrant to search for narcotics in a briefcase where the supporting affidavit related

the facts leading up to the stop as well as details about the suspects' possession of the briefcase, a dog alerted to the briefcase inside the car, and the dog had been certified by U.S. Customs.

**Am Jur 2d, Searches and Seizures §§ 64, 68-70, 97.**

**Use of trained dog to detect narcotics as unreasonable search in violation of Fourth Amendment. 31 ALR Fed 931.**

Judge COZORT concurring.

Judge GREENE dissenting.

APPEAL by defendant from order entered 15 June 1990 by *Judge Donald W. Stephens* in WAKE County Superior Court. Heard in the Court of Appeals 9 April 1991.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General Francis W. Crawley, for the State.*

*Cheshire, Parker, Hughes & Manning, by Joseph Blount Cheshire, V, and George Bullock Currin, for defendant-appellant.*

PARKER, Judge.

Defendant pled guilty to charges of trafficking in cocaine by conspiracy, trafficking in cocaine by possession and trafficking in cocaine by transportation. Pursuant to N.C.G.S. § 15A-979(b) defendant reserved his right to appeal the lower court's denial of his motion to suppress. The evidence presented by the State on *voir dire* tended to show that defendant traveled with a companion by private charter plane from Raleigh-Durham International Airport (herein "RDU") to the New York City area late on a Saturday night. The two men returned to RDU a few hours later. Acting upon information from a concerned citizen, two agents of the State Bureau of Investigation (herein "SBI") made inquiries and suspected criminal activity. The agents arranged for additional officers to assist and waited for defendant and his companion to return from their trip. For reasons to be discussed later, the agents decided not to stop the two men until they started driving their vehicle away from RDU. The SBI enlisted the assistance of the highway patrol for this stop. An identity check during the stop revealed that the car's driver and defendant passenger had chartered their flight under fictitious names. Two SBI agents asked the driver

and defendant to step out of the car. After the men had been pat down searched, one of the agents asked for consent to search the vehicle. The driver indicated that the officers could search the car.

In the search, an agent located a handgun in the glove box, from which defendant had been observed withdrawing his hand after the car had been stopped. The agent also picked up a briefcase from the floor and asked both the driver and defendant if the case was his. Defendant stated that the case belonged to his cousin and objected to a search of the case without a warrant. The agent placed the case on the back seat and advised the driver that the SBI wished to use its drug detection dog, which had been brought to the scene. Neither defendant nor his companion objected. The dog was put through its standard routine and ultimately gave a positive reaction to the briefcase. Knowing that this dog signals, by scratching and biting, only in the presence of the odor of controlled substances it has been trained to recognize, the agents placed defendant and his companion under arrest. The agents then procured a search warrant before opening the briefcase, which contained two kilograms of cocaine. Additional facts will be detailed in discussion of the issues raised on appeal.

Defendant appeals denial of his motion to suppress on five grounds: (i) the drug agents making the investigative stop of the car lacked reasonable, articulable suspicion; (ii) defendant's detention was an intrusion even more serious than an investigative stop, requiring probable cause; (iii) there was no valid consent to the search of the car; (iv) sniffing of the briefcase by a drug detection dog was an illegal search; and (v) the warrant to search the briefcase was not based on probable cause. We find that the court's findings of fact were clearly supported by the evidence presented at an extensive suppression hearing and its conclusions of law are, therefore, conclusive for purposes of appellate review. *State v. Thompson*, 296 N.C. 703, 252 S.E.2d 776, *cert. denied*, 444 U.S. 907, 62 L.Ed.2d 143 (1979). The trial judge properly denied the suppression motion.

I.

[1]   As to defendant's first assignment of error, the existence of reasonable suspicion establishes the constitutionality of a temporary investigative, warrantless seizure. *Id.* at 706, 252 S.E.2d at 779. The warrantless seizure of a person does not violate the Fourth Amendment so long as the officer is "able to point to specific

and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 20 L.Ed.2d 889, 906 (1968); *see also State v. Sugg*, 61 N.C. App. 106, 300 S.E.2d 248, *disc. rev. denied*, 308 N.C. 390, 302 S.E.2d 257 (1983). Similarly, objective facts and circumstantial evidence, leading a trained officer to conclude that criminal activity may be occurring, are "a sufficient basis to justify an investigative stop" of a moving vehicle. *United States v. Cortez*, 449 U.S. 411, 413, 66 L.Ed.2d 621, 625 (1981).

The trial court found the entire eyewitness testimony of three SBI agents and a State trooper "credible and worthy of belief," despite defense counsel's rigorous cross-examination of those witnesses at the hearing. That testimony disclosed the following facts supporting the officers' reasonable suspicion that defendant was involved in ongoing criminal activity. The facts known to the officers at the time of the stop "must be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by experience and training." *State v. Harrell*, 67 N.C. App. 57, 61, 312 S.E.2d 230, 234 (1984).

Receiving information that an air charter agent suspected drug smuggling activity, the SBI learned that defendant and another man, using the names "Mr. Smith" and "Mr. Jones" without first names, had arranged to charter a plane from Carolina Charter Service (herein "Carolina") to fly late at night to a location in New Jersey only a taxicab ride away from New York City. The officers knew that the New York City area is the source of about ninety percent of the illegal drugs brought into central North Carolina. The two men had made an identical trip the weekend before out of RDU, using a different airline charter service; the men had been referred to Carolina when they attempted to hire the service again and it had no available planes. Dressed in "shiny," "silky," "flashy" business suits, the two men took off around 6:30 p.m. and landed back in North Carolina at 1:30 a.m. Sunday. The men paid $1,270.00 in cash for their flight. Businessmen using private charter services usually pay by business check or credit card; the officers testified that paying by cash is "a very common practice by people traveling as drug couriers." Drug smugglers are known to carry large amounts of cash; defendant carried a briefcase that the chief SBI agent surmised to be transporting cash to the New York area.

STATE v. McDANIELS

[103 N.C. App. 175 (1991)]

Further, the men gave Carolina two telephone numbers, which the SBI attempted to verify without success. One of the numbers was disconnected and the other did not show a separate phone listing for either a Smith or a Jones. An officer testified that "[s]omeone who might be involved in narcotics trafficking does not tend to want to put down his correct phone number." Upon its arrival at RDU the car in which defendant was riding, with heavily tinted glass, first circled the parking area for Carolina and then drove away from the parking area before returning five to ten minutes later to park. The officers believed that the car's occupants might have been watching out for police. A police check on the parked car, made during the time the men were on their trip, revealed that the license plate was in the name of a Durham woman named Frye but was assigned to a different car and that the vehicle identification number was registered to an owner named neither Smith nor Jones in another part of the State. Finally, while the briefcase suggested a business transaction, late on Saturday night seemed to the SBI agents an unusual time to conduct business when combined with the other suspicious factors in the case.

At the suppression hearing the prosecutor asked the main SBI agent on the case if he considered these factors "individually, or did you consider [the factors] altogether in making this decision?" The agent responded that "it was the totality of everything." He later expanded on that point.

Q. [T]o what extent if any was there one particular factor that you've listed that by itself made you suspicious?

A. I don't know that there was one factor. There were a number of factors, and they continued right up through the time that we talked to [the two men] on the side of the road once we discovered that they were traveling under fictitious names, we discovered that with certainty.

We agree with the trial court that these particularized facts raised a reasonable suspicion permitting the officers to make a forcible stop, for purposes of dispelling or confirming the agents' suspicions of criminal activity. It has long been the law that

[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 146, 32 L.Ed.2d 612, 617 (1972); *see also Florida v. Royer*, 460 U.S. 491, 502, 75 L.Ed.2d 229, 239 (1983) (articulable suspicion to stop suspected drug courier in order to check identity, with subsequent discovery that suspect was traveling under an assumed name); *State v. Allen*, 90 N.C. App. 15, 28-29, 367 S.E.2d 684, 691-92 (1988) (facts supporting articulable suspicion for police encounter with defendant outside airport terminal); *State v. Perkerol*, 77 N.C. App. 292, 335 S.E.2d 60 (1985), *disc. rev. denied*, 315 N.C. 595, 341 S.E.2d 36 (1986) (courier trafficking in cocaine). We, therefore, overrule defendant's first assignment of error.

## II.

[2]  Next, defendant argues that the detention of the car and its two occupants was tantamount to an arrest, requiring probable cause, given the circumstances attending the agents' decision to wait to stop him and his companion until the two of them were driving away from the airport. The facts developed during the suppression hearing do not support defendant's arguments with regard to the location of, or other circumstances surrounding, the stop.

The officers testified that they stopped the suspects outside the parking area for several reasons. First, the charter service owner feared physical retaliation from drug smugglers against "a couple of million dollars' worth of aircraft," if the suspects were stopped near his hangar and Carolina was suspected of being an informant. Therefore, the owner specifically requested that the stop be made away from the hangar. Second, the parking area for the charter service had "no lights" and adjoined a number of "little alleyways." "It's not the big parking lot; it's a driveway-parking-lot-type situation." The chief SBI agent testified that he "had a lot of concern for confronting two individuals who I didn't know who they were in the dark, because there's no lights there whatsoever in that parking area there where the car was parked." "It's pretty dark in that area. And we wanted to be as safe as we could." Third, and perhaps paramount in the officers' minds, there is no X-ray or metal detector screening for weapons of passengers boarding private flights. The officers testified uniformly that they had considerable concern about their own safety and that of innocent bystanders. Finally, the officers also had safety concerns about a high-speed chase, "either in the area of the airport

STATE v. McDANIELS

[103 N.C. App. 175 (1991)]

itself where people would be on foot and in vehicles and also out on the interstate highway."

The prosecutor asked the chief agent how the circumstances of defendant's travel affected the officers' decision about the location for the investigative stop.

Q. You said that in an ordinary interdiction situation a vehicle's not involved, a car's not involved. How was this situation different from the ordinary interdiction or a general interdiction?

A. We primarily operate in the terminals itself and are concerned with people getting on or getting off the commercial aircraft. This is one where it was a charter; and we knew the gentlemen were going to come off the plane, get in their car, and drive away. And we had to get them to the safest place for everyone concerned.

As the United States Supreme Court has observed, "a perfectly reasonable apprehension of danger may arise long before the officer is possessed of adequate information to justify" an arrest. *Terry*, 392 U.S. at 26-27, 20 L.Ed.2d at 909.

Defendants were stopped a short distance from the charter service, before their car even passed the commercial airline terminals. In order to be able to intercept defendant's vehicle as it proceeded to one of the two major arteries out of the airport, the SBI had asked the highway patrol to place a car near each of those two possible egress points.

[W]e determined that the safest place to stop them was at the intersection there on a small service road between Terminal C and Terminal A and B. It's an area that's lit up to the point of almost being daylight with extremely strong, bright streetlights; and it's out of the public.

Other facts likewise fail to suggest the intrusiveness of an arrest. The duration of the investigative stop, up to the time the officers received consent to search the car, was "[p]robably not two minutes." The brevity of an investigative stop is a key factor in justifying such a seizure. *Dunaway v. New York*, 442 U.S. 200, 60 L.Ed.2d 824 (1979); *State v. Grimmett*, 54 N.C. App. 494, 284 S.E.2d 144 (1981), *disc. rev. denied and appeal dismissed*, 305 N.C. 304, 290 S.E.2d 706 (1982); *see also* ALI, Model Code of Pre-Arraignment Procedure § 110.2(1) (1975) (recommending a maximum

of twenty minutes for a *Terry* stop). During the two minutes of the stop in this case, the officers confirmed their suspicion that the travelers, "Mr. Smith" and "Mr. Jones," purchased the tickets for their charter flight under assumed names. The names on the suspects' New Jersey driver's licenses were Michael McDaniels and Clark Waddell. After patting the suspects down for weapons, the officers obtained Waddell's consent to search. "The officer may question the driver and passengers . . . and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 45 L.Ed.2d 607, 617 (1975) (approving investigative stop of moving vehicle). Adding the time it then took an agent and the dog to search the car, the total elapsed time from the officers' stopping the car up to defendant's arrest was ten to fifteen minutes, according to the chief SBI agent, or possibly twenty-five to thirty minutes, according to the State trooper's estimate.

Further, only the main agent approached the driver's side of the car upon its being stopped. The blue lights on the agent's car and the trooper's car "up ahead," the only lights used to bring the suspects' car to a halt, were not left on. A second agent approached the front passenger side where defendant was sitting. "[P]rior to the individuals being arrested, the only people who came to the car was myself, Agent Black, and Captain Brown was standing at the back of the car." The officer at each side of the car spoke in a normal, calm voice and used a non-threatening tone. The officers testified that the suspects were never surrounded and, in fact, other officers kept at "a distance further than the length of this courtroom." Defendant makes much of the fact that there were a number of officers at the scene; however, our Supreme Court has refused to hold that police coercion exists as a matter of law even when ten or more officers are present with a suspect in his own home before the suspect consents to a search. *State v. Fincher*, 309 N.C. 1, 25, 305 S.E.2d 685, 700 (1983) (Exum, J., dissenting in part and concurring in part).

Moreover, no weapons were visible on any officer except for the State trooper, who was in standard uniform. No weapons were drawn, nor was any police gun out of its concealed holster. Several officers were in plainclothes; a few had on jackets with official logos, although their dress was still casual. No officer's bulletproof vest was exposed to view. Finally, no force was used to get the

occupants to step out of the car once it became apparent that both men were traveling under false names. The officers then informed the two men that this was a narcotics investigation.

Even if, by show of authority, the officers "seized" defendant for Fourth Amendment purposes and our discussion indicates that there was such a seizure in this case, a seizure is not *per se* an arrest. Indeed, the United States Supreme Court, differentiating an informal encounter between an officer and a citizen from an investigative stop implicating constitutional protections, illustrates the meaning of "seizure" as follows.

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*United States v. Mendenhall*, 446 U.S. 544, 554, 64 L.Ed.2d 497, 509 (1980). Only one of these factors, the presence at the scene of several officers, existed in this case. Finally, defendant complains that the stop occurred "late at night, in a remote area of the airport property." We note that the lateness of the stop was determined solely by the time defendant himself had chosen for returning to the State from New Jersey; the allegedly remote area was very well lit and in fact a public road.

For all these reasons, this Court finds no irregularity, and certainly not a situation of arrest, in this investigative stop. The seizure in this case, supported as it was by reasonable suspicion, was constitutional. *See, e.g., State v. Sugg*, 61 N.C. App. at 108-109, 300 S.E.2d at 250 (limited investigative stop is one of "three tiers of police encounters" and distinguishable from full-scale arrest).

### III.

[3] Defendant's next assignment of error concerns the alleged invalidity of the driver's consent to police to search the car. We have considered each of defendant's specific contentions in this assignment: (i) the driver's consent was coerced by implied threat; (ii) even if consent was voluntary, the driver did not have apparent control or apparent custody of the stopped car and, therefore, could not give effective consent to the search; and (iii) even if the consent was voluntary, the scope of the consent did not extend to the

sniffing of the air surrounding the briefcase. This Court agrees with the trial court's conclusion that defendant, because not the person in apparent control of the car, had no reasonable expectation of privacy "as to any area within the vehicle." Nor do we disagree with the trial court's conclusions that defendant had apparent authority over the briefcase and that he exercised his lawful right to refuse to consent to a warrantless search of the interior of the briefcase. That refusal was not overridden.

Initially, we note that defendant never objected to the driver's consent at the scene, nor did defendant ever assert ownership rights in either the car or any of its contents. Even if defendant had ownership rights in the contents of the car, and we find no evidence that he did, failure to speak and assert the personal right of immunity from unreasonable search and seizure "amount[s] to a voluntary consent to search," where the person who remains silent knows that the driver has given his verbal consent to a search. State v. Coffey, 255 N.C. 293, 297-98, 121 S.E.2d 736, 740 (1961); see also State v. Foster, 33 N.C. App. 145, 148, 234 S.E.2d 443, 446 (1977) (silence in face of consent by person in apparent control of car permits court to infer consent by person remaining silent, "[e]ven assuming" that person remaining silent "was in some way a part owner of the car").

We now turn to each of defendant's arguments concerning the search of the vehicle. First, the facts surrounding the driver's consent demonstrate no coercion by the police, implied or otherwise. When the driver's identification disclosed the name Waddell with a domicile in New Jersey, he was asked to step outside the car. The main SBI agent reported that he used a normal tone of voice and that the driver remained "fairly composed."

> He stepped out of the vehicle a short distance away from the car. I explained to him that we were involved in a narcotics investigation and would appreciate his cooperation. I asked him for his consent to conduct a search of the vehicle. He said to go ahead but the car was not his and nothing in it was his.

The officers' testimony that they used absolutely no force was not contradicted at the suppression hearing. Under these facts defendant has failed to make a showing of involuntary consent by the driver. See, e.g., State v. Fincher, 309 N.C. 1, 305 S.E.2d 685 (1983) (defendant's signature on consent form was voluntarily, willingly and understandingly made, notwithstanding presence of

at least ten officers at the scene, defendant's age of 17 and defendant's evidence that (i) he had an IQ in range between 50 and 65; (ii) he suffered from a schizophreniform disorder; and (iii) he was more susceptible than average person to fear and intimidation); *State v. Casey*, 59 N.C. App. 99, 112, 296 S.E.2d 473, 482-83 (1982).

Second, under the applicable State statutes the consent was effective to bestow permission on the agent to search the car. N.C.G.S. § 15A-221(a) provides for warrantless searches and seizures "if consent to the search is given." Under N.C.G.S. § 15A-222(2) the requisite consent "must be given" either by the registered owner of the car "or by the person in apparent control of its operation and contents at the time consent is given . . . ." N.C.G.S. § 15A-222(2) (1988). "Our courts have often found that consent given by the owner or person lawfully in control of a vehicle is sufficient to justify a search that yields evidence used against a non-consenting passenger." *State v. Mandina*, 91 N.C. App. 686, 695, 373 S.E.2d 155, 161 (1988) (citations omitted). A driver is in "apparent control" of a car and its contents, whether the vehicle or its contents belong to him or to others. The officers at the scene had reason to believe that the driver was probably not the registered owner, since they had run a vehicle check earlier in the evening. Still, the driver's words of consent were sufficient to justify the agent's continuing assumption that the driver was lawfully in control of the car. If the driver had either refused to consent or told the agent that the car was stolen, this case would be different.

This Court also rejects defendant's argument that his companion's consent was limited in scope. Nothing in the record suggests that Waddell told the officers certain areas or certain items were "off limits." Nor is there any record evidence of the driver's limiting the manner of search. In particular, there is no evidence that either defendant or the driver objected to police use of a dog to continue searching the car; nor did the driver ever attempt to modify or withdraw his initial consent to the search. These facts concerning the suspects' failure to object are similar to those in *State v. Jones*, 96 N.C. App. 389, 386 S.E.2d 217 (1989), *disc. rev. denied and appeal dismissed*, 326 N.C. 366, 389 S.E.2d 809 (1990), in which this Court found no restriction on the scope of a driver's consent to search a vehicle.

Further, contrary to defendant's contention, this Court also finds no Fourth Amendment violation in the SBI's handling of the

briefcase during its investigation of the inside of the car. An agent searching the car picked up a briefcase on the back floorboard and first asked the driver and then defendant if it belonged to either man. After defendant told the agent the case belonged to his cousin and that he did not think the police should search the cousin's briefcase without a search warrant, the agent replaced the briefcase in the car, unopened. If defendant had a privacy interest at all, it was limited to the contents of the briefcase, as found by the trial court. Those contents were not examined until after the agents had procured a search warrant. We note further that under *Florida v. Jimeno*, --- U.S. ---, 114 L.Ed.2d 297 (1991), a police officer may now search a closed container found in a vehicle, where the officer has the suspect's general consent to search and the officer might reasonably believe the container holds the object of the search. *See also California v. Acevedo*, --- U.S. ---, 114 L.Ed.2d 619 (1991) (closed container in stopped vehicle may be searched without warrant so long as police have probable cause to believe contraband or evidence of crime is contained therein).

For each of the foregoing reasons, we reject these arguments in defendant's third assignment of error.

IV.

[4] If the driver's consent is deemed to be valid, defendant next argues that the alleged "search" of the briefcase in the car by a police dog certified in drug detection was illegal. Defendant first contends that the drug detection dog was thrust into the car without giving either man opportunity to object. The facts developed at the suppression hearing, however, show only that the chief agent was keeping the driver advised and informed "of what we were doing, because he had already given us consent to search the vehicle." "It was more an informational thing than anything else." The driver not having objected to the dog's being put into the car, the search proceeded.

As defendant mentions in his statement of the facts, the dog immediately jumped out of the car upon being introduced to the car's interior. The possible significance of the dog's unusual reaction, left unexplained by defendant, was explored on *voir dire*.

Q. What if any unusual odor did you observe in the automobile?

A. A very strong odor of deodorizers in the car. There were deodorizers hanging in more than one location inside the car, and there was a very strong odor in the car from those.

THE COURT: Let me ask you about that. . . .

Does cocaine have any particular smell?

A. Yes, sir, it does.

THE COURT: Detectible to the human nose?

A. Only if you're very close to where the cocaine is or if there's a large quantity of cocaine present . . . .

The dog's handler gave similar testimony:

I feel the reason he jumped out of the vehicle was because the odor of the perfumes was so strong. I can only describe it as it smelled to me like somebody had dumped a bottle of cologne in the vehicle.

Nor, as defendant argues, did the sniffing of the exterior of the briefcase by a well trained and exceptionally skilled drug detection dog amount to a "search" within the meaning of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707, 77 L.Ed.2d 110, 121 (1983); *see also United States v. Bronstein*, 521 F.2d 459 (2d Cir. 1975). Defendant's authority on this point is not analogous to the consensual situation in the present case. *Cf. People v. Unruh*, 713 P.2d 370 (Colo. 1986) (reasonable expectation of privacy invaded by police use of dog to sniff locked safe from defendant's basement).

In this case the trial court also questioned the SBI dog handler about the use of the K-9. The handler testified about his experience with this dog, the only one used by the SBI at that time, the dog's qualifications and excellent track record and the significance of the dog's scratching and biting the briefcase. "I knew at that point that there was, in fact, a controlled substance in that briefcase." The trial court then asked the handler whether he could possibly influence the dog to give a false positive alert. The handler replied: "I know of no instance in which I could make the dog alert to—to a particular item because he's alerting to the odor [and not anything the handler does]." Later the same witness explained to the court that "the dog cannot alert if he doesn't smell the narcotic odor."

Finding no merit in any of defendant's arguments about the use of a trained drug dog, we overrule his fourth assignment of error.

## V.

[5] Finally, defendant attacks the warrant obtained for search of the briefcase for lack of probable cause. This attack is groundless. The magistrate, considering all the evidence contained in the officer's affidavit, properly determined under the totality of the circumstances "whether there exist[ed] a fair probability that evidence of a crime can be found in a particular place." *State v. Greene*, 324 N.C. 1, 8, 376 S.E.2d 430, 436 (1989), *sentence vacated*, --- U.S. ---, 108 L.Ed.2d 603 (1990) (mem.). The information given to the magistrate established probable cause under the lay, nontechnical standard applied to probable cause for search warrants. *Id.* at 8, 376 S.E.2d at 435. There is no longer an independent requirement that an informant—here, defendant argues, the dog— be proven reliable. *Id.* at 8-9, 376 S.E.2d at 436.

The affidavit supporting application for the search warrant relates facts leading up to the police stop as well as specific details about the suspects' possession of a briefcase. The affiant states that once consent to search was obtained,

> [t]he SBI narcotic detection K-9 was put around and in the vehicle. During the sea[r]ch inside the vehicle the K-9 gave a positive alert to a brown briefcase located in the back floorboard. The K-9, Tazmanian, is certified by US Customs . . . .

The dog's certification extended to cocaine, heroin, marijuana and hashish. The briefcase contained cocaine. Initial certification of the dog occurred in 1983, with recertification on 1 September 1988. The magistrate issued the search warrant on 25 September 1988. This Court accords a magistrate's determination of probable cause great deference. *Id.* at 8, 376 S.E.2d at 436. We overrule the final assignment of error.

Affirmed.

Judge COZORT concurs in separate opinion.

Judge GREENE dissents in separate opinion.

Judge COZORT concurring, with separate opinion.

I am compelled to comment on the dissent's comparison of the stop in this case with the "typical airport stop case" and the dissent's apparent conclusion that the evidence must be suppressed because the intrusion of the officers here was greater than that of the typical airport stop. That conclusion is unrealistic and ignores the need for the officers to make appropriate plans for their safety and that of innocent charter flight workers and other bystanders. The testimony in this case demonstrates admirable caution, given the situation, on the part of the officers. The defendant's darkened vehicle was parked in a dark area adjoining little alleyways. These circumstances must be considered when determining what constitutes appropriate constitutional intrusiveness. We should not demand, as the dissent apparently does, that one officer approach a darkened vehicle in a dark area, occupied by suspected drug couriers who may be armed, to "ask a few questions," in complete disregard of the safety of himself, other officers and bystanders. The stop in this case, though longer and with more officers than that approved in an open well-lighted airport, was constitutional under the circumstances.

Judge GREENE dissenting.

I agree with the majority that the defendant was seized for Fourth Amendment purposes. See California v. Hodari D, --- U.S. ---, 113 L.Ed.2d 690 (1991). However, I disagree that the seizure was constitutional. Instead I agree with the defendant that the "initial stop and detention . . . constituted a more serious intrusion than that allowed on mere reasonable suspicion and was tantamount to an arrest."

In order to apply the law to the evidence, it is necessary to expound some on the facts as shown in the record. Agent Turbeville testified on direct and cross-examination as follows:

Q. Agent Turbeville, to what extent if any did you plan to stop that car for further investigation?

A. Well, first of all, we had to decide where we were going to stop them at; and we determined that the safest place to stop them was at the intersection there on a small service road between Terminal C and Terminal A and B. It's an area that's lit up to the point of almost being daylight with extreme-

STATE v. McDANIELS

[103 N.C. App. 175 (1991)]

ly strong, bright streetlights; and it's out of the public. And once they reached that point I radioed ahead to Sergeant George to turn on his blue light, who was directly in front of them and at the stop sign, which would prevent them from running. And I was behind them so they would not get out into traffic and pose any danger for anyone.

. . . .

THE COURT: Were you in radio contact with him [Sergeant George]?

A. Yes. And once we got to this area here (indicating), which is an extremely well-lit area, that's when I asked him, when he pulled up to that stop sign, I asked Sergeant George to turn on his blue light. And there was no place for the car to go at that point. He couldn't get around us because there's an island in the road there.

. . . .

Q. Right. Okay. Now, again to describe when the car stopped, you indicated with your diagram where the cars were, where did the police individuals go at the time the suspect car was stopped?

A. I went to the driver's door. Special Agent Black went to the passenger door. Captain Brown was at the rear of the vehicle, and Sergeant George exited his car and was standing by the front door with the front door open to his car.

Q. So, there was an officer in front of the car, behind the car, and on both sides of the car?

A. That's correct.

Q. And did you say Officer Black went to the passenger door?

A. Yes.

Q. And you went to the other door?

A. Driver's door.

Q. Where were the other officers?

A. In the other vehicles?

Q. Yes, sir?

A. They all stayed with their vehicles. I'm not sure if all of them got out or not. I don't recall all of them being out of their vehicles, but they all stayed at their vehicles. Nobody came up. I had directed them earlier not to come up to the car.

. . . .

Q. Well, did Mr. McDaniels voluntarily walk up to the front of the vehicle?

A. Again, you'd [sic] to ask Agent Black about that.

Q. Did Mr. Waddell voluntarily walk up to the front of the car?

A. He walked — he got out of the car voluntarily and he came over, sort of to the side of the front of the vehicle, yes, sir.

Q. He walked with you?

A. Yes.

Q. A police officer?

A. Yes.

Q. Identified himself as a police officer?

A. Yes.

Q. In the presence of seven or eight other police officers?

A. Yes.

Q. Four other police vehicles?

A. Yes.

Summarized, the State's evidence shows the following: The vehicle in which the defendant was a passenger was stopped near the airport at approximately 2:00 a.m. One officer blocked the defendant's path and turned on his blue light. Another officer came up behind the defendant in another vehicle and turned on his blue light. When the defendant's car stopped, one officer went to the driver's door, another officer went to the passenger's door, another officer went to the rear of the vehicle, and another officer went to the front of the vehicle. A total of four police vehicles surrounded the defendant's vehicle. There were approximately nine police officers at the scene. Other than the four officers who came to the

defendant's vehicle, the other officers remained in or near their vehicles. The defendant was asked by one of the officers to step out of the vehicle. After getting out of the vehicle, the defendant was subjected to a "pat down" search. Then the driver of the vehicle was asked by one of the officers if he would consent to a search of the vehicle. The driver agreed.

In *Terry v. Ohio*, 392 U.S. 1, 20 L.Ed.2d 889 (1968), our United States Supreme Court recognized a "narrowly drawn" exception to the probable cause requirement of the Fourth Amendment for seizures of the person that do not rise to the level of an arrest. Therefore, *Terry* defined a special category of Fourth Amendment seizures. If the "nature and extent of the detention are minimally intrusive," a seizure may be supported on less than probable cause. *United States v. Place*, 462 U.S. 696, 703, 77 L.Ed.2d 110, 118 (1983). The "critical threshold issue" of whether the seizure qualifies as a *Terry* stop or instead amounts to a defacto arrest is the "intrusiveness of the seizure." *Id.* at 722, 77 L.Ed.2d at 131 (Blackmun, J., concurring). The lower the magnitude of the intrusion, the more likely it qualifies as a *Terry* stop.

Here, the seizure of the defendant is indistinguishable from a traditional arrest, and "any 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway v. New York*, 442 U.S. 200, 213, 60 L.Ed.2d 824, 836 (1979). This case is unlike the typical airport stop case, wherein an officer approaches an individual and asks a few questions in a minimally intrusive manner. The Fourth Amendment requires more to justify the maximal intrusion in this case. Because the State concedes there was no probable cause to stop the defendant, the defendant's motion to suppress the evidence obtained as a result of this unlawful stop should have been allowed. *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441 (1963) (confession, as well as physical evidence obtained as a direct result of an arrest unsupported by probable cause, must be suppressed). I therefore would reverse the ruling of the trial court on the defendant's motion to suppress and grant the defendant a new trial.