An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-21

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

v.                                    Wake County
                                      No. 11CRS214547
RODNEY NIGEE PLEDGER TAYLOR,
     Defendant.


Appeal by defendant from Judgment entered on or about 23 January 2013 by Judge Carl R. Fox in Superior Court, Wake County. Heard in the Court of Appeals 4 June 2014.


> *Attorney General Roy A. Cooper III, by Assistant Attorney General Kathleen N. Bolton, for the State.*
>
> *Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance E. Widenhouse, for defendant-appellant.*


STROUD, Judge.


Rodney Taylor ("defendant") appeals from the judgment entered after a Wake County jury found him guilty of first degree murder. We find no error at defendant's trial.

## I.   Background

Defendant was indicted for first degree murder on 12 June 2011. He pled not guilty and proceeded to jury trial. Before

trial, defendant filed a motion to suppress statements he made to police. He argued that he had been unconstitutionally seized and that he was subjected to custodial interrogation without the benefit of *Miranda* warnings. The trial court denied defendant's motion by order entered 17 January 2013.

At trial, the State's evidence tended to show that on the evening of 23 June 2011, defendant (also known as "Sponge Bob"), Alex Walton (also known as "Biz" or "Mr. Business"), and Floyd Creecy (also known as "Bruno" or "Big Bs") got together to hang out and smoke marijuana. All three men were involved in a local gang named "Bounty Hunters," which was affiliated with the larger "Crips" gang.[1] The three men went to a store on Poole Road in east Raleigh to buy some cigars to make "blunts." They all rode together in the black Chrysler Pacifica owned by Mr. Creecy's wife.

After buying what they needed from the store, the three men got back into Mr. Creecy's car and drove back down Poole Road. Mr. Creecy was driving, defendant was in the passenger seat, and Mr. Walton was sitting in the back. As they were riding down Poole Road, defendant said, "There's Polo," and told Mr. Creecy

---

[1] Mr. Creecy denied being in a gang, but Mr. Walton testified that Mr. Creecy was "mentor" to the two younger men in the "Bounty Hunters."

to pull over. There were three individuals walking down the sidewalk—Darius Johnson (also known as "Polo"), Damal O'Neil, and Kyonatai Cleveland. Mr. Creecy pulled into a church parking lot behind them. Defendant exited the car and approached the three; Mr. Walton then got out and followed defendant.

As defendant and Mr. Walton approached, Mr. Johnson took out what he had in his pockets, including his cell phone, and gave it to Ms. Cleveland. He also took out a wine opener that he had in his pocket, opened a small knife at the end of the opener, then closed the knife and put the opener back in his pocket. Defendant said to Mr. Johnson, "Why didn't you get back to us?" Mr. Johnson responded, "I don't know." Defendant then said, "Well, I gave you more than enough time." At that point, defendant said to Mr. Walton, "Watch out, Biz," pulled out a black revolver and began shooting at Mr. Johnson.

During this encounter, Ms. Cleveland called 911. However, she was unable to tell the operator what was happening because when they saw the gun, Mr. Johnson and his two friends tried to run. Mr. Johnson was hit by one bullet in his front left abdomen. The forensic evidence suggested that the bullet was fired from a close distance—perhaps less than two feet. After shooting Mr. Johnson, defendant and Mr. Walton ran back to the

black Pacifica, which Mr. Creecy had pulled around to the next street. The gun was still in defendant's hand when he got back into Mr. Creecy's car.

At trial, Mr. O'Neil, Ms. Cleveland, Mr. Walton, and Mr. Creecy all testified to the events of that night. The three men all positively identified defendant as the shooter. Mr. Walton and Mr. Creecy testified that defendant and Mr. Johnson had an argument approximately a week before the shooting. Mr. Johnson had been asking defendant about joining the Bounty Hunters. Defendant told Mr. Johnson to call him. When Mr. Johnson failed to call him, defendant said that he was going to "bang," i.e. shoot, Mr. Johnson.

Defendant was asked to come to the police station to be interviewed by detectives. He initially denied knowing anything about the shooting, but later admitted that he was in the SUV. He said that the shooter was someone named "Chuck." He later conceded that there was no one named Chuck but continued to deny that he was the shooter. Defendant claimed that after the shooting, he brought the gun back to his house. The detectives went to defendant's grandmother's house, where he was living. When they arrived, defendant's grandmother informed them that she had found a gun in her grandson's room, under his bed. She

explained that she did not want the gun in her house, so she took it outside and hid it in her backyard. The police recovered the gun—a black .38 caliber revolver. Four spent shell casings were found in the revolver. Once the gun was recovered and the interview was complete, defendant was placed under arrest. Upon being transported to the jail, two deputies searched defendant's pockets and found two .38 caliber bullets.

The jury found defendant guilty of first degree murder. The trial court accordingly sentenced defendant to life in prison without the possibility of parole. Defendant gave notice of appeal in open court.

## II. Motion to Suppress

Defendant first argues that the trial court erred in denying his motion to suppress statements he made to police. He contends that the statements should have been suppressed because they were fruits of an unconstitutional seizure and taken in violation of his Fifth Amendment rights. We disagree.

A.  Standard of Review

> The standard of review in evaluating the denial of a motion to suppress is whether competent evidence supports the trial court's findings of fact and whether the findings of fact support the conclusions of law. However, when . . . the trial court's findings of fact are not challenged on appeal, they are deemed to be supported by

> competent evidence and are binding on
> appeal. Conclusions of law are reviewed de
> novo and are subject to full review. Under a
> *de novo* review, the court considers the
> matter anew and freely substitutes its own
> judgment for that of the lower tribunal.

*State v. Biber*, 365 N.C. 162, 167-68, 712 S.E.2d 874, 878 (2011)
(citations and quotation marks omitted).

First, we address defendant's argument that he was
unconstitutionally seized. Defendant argues that the police
lacked any reasonable suspicion to stop him even though he was
driving a car known to be associated with a murder suspect, at
least once they realized that he was not the suspect they were
initially seeking. Defendant does not contest the findings of
fact relating to the initial stop and detention other than part
of Finding 11, so those findings are binding on appeal.

> An investigatory stop must be justified by a
> reasonable suspicion, based on objective
> facts, that the individual is involved in
> criminal activity. *Terry v. Ohio* and its
> progeny have taught us that in order to
> conduct a warrantless, investigatory stop,
> an officer must have a reasonable and
> articulable suspicion of criminal activity.
>
> A court must consider the totality of the
> circumstances—the whole picture—in
> determining whether a reasonable suspicion
> to make an investigatory stop exists. The
> stop must be based on specific and
> articulable facts, as well as the rational
> inferences from those facts, as viewed
> through the eyes of a reasonable, cautious

officer, guided by his experience and training. The only requirement is a minimal level of objective justification, something more than an unparticularized suspicion or hunch. As a result, the ultimate issue before the trial court in a case involving the validity of an investigatory detention is the extent to which the investigating officer has a reasonable articulable suspicion that the defendant might be engaged in criminal activity.

*State v. Mello*, 200 N.C. App. 437, 443-44, 684 S.E.2d 483, 488 (2009) (citations, quotation marks, and brackets omitted).

The suspicion here was not of ongoing criminal activity, but of connection to a completed murder.

[P]olice are not automatically shorn of authority to stop a suspect in the absence of probable cause merely because the criminal has completed his crime and escaped from the scene. The precise limits on investigatory stops to investigate past criminal activity are more difficult to define. The proper way to identify the limits is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.

*United States v. Hensley*, 469 U.S. 221, 228, 83 L.Ed. 2d 604, 611-12 (1985).

"[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.* at 229, 83 L.Ed. 2d at 612. "It is well settled that information given by one officer to another is reasonably reliable information for the purpose of supporting a search or seizure." *State v. Ellison*, 213 N.C. App. 300, 307, 713 S.E.2d 228, 234 (2011), *aff'd*, 366 N.C. 439, 738 S.E.2d 161 (2013). Moreover, "[i]t has long been the law that a brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *State v. McDaniels*, 103 N.C. App. 175, 181, 405 S.E.2d 358, 362 (1991) (citation, quotation marks, and brackets omitted), *aff'd per curiam*, 331 N.C. 112, 413 S.E.2d 799 (1992).

Here, the trial court found, in relevant part, that:

1. On 24 June 2011, Detective Gory Mendez was employed with the City of Raleigh as a detective with the Raleigh Police Department's Technical Response Unit. Detective Mendez has been a detective for two years, although he has been employed as a police officer for over eleven years.

He also worked as a police officer for the City of Winston-Salem for over two years.

2. On 24 June 2011, Detective Mendez was attempting to locate a homicide suspect named Alexander Walton. A vehicle Mr. Walton was known to operate, a green Dodge Stratus, was found in North Raleigh in the parking lot of some apartments . . . .

3. Detective Mendez was assigned to maintain visual surveillance on the green Dodge Stratus automobile . . . .

4. Alexander Walton is a light-skinned black male who is approximately five feet ten inches tall, weighing 135 pounds and wore his hair in dreadlocks.

5. Detective Mendez conducted surveillance on the green Dodge Stratus for an hour or two.

6. While conducting surveillance on Mr. Walton, Detective Mendez noticed a suspect wearing something on or over his hair left the apartment nearby and went straight to the Stratus. He entered the vehicle and sat in the driver's seat.

7. At that time, Detective Mendez moved his police car directly behind the green Dodge Stratus, exited his vehicle wearing a tactical vest with "RPD" on the front with his gun drawn at the low-ready position and approached the vehicle.

8. Detective Mendez ordered the occupant to show him his hands and exit the vehicle.

9. The occupant got out of the vehicle as ordered. He was directed to place his hands on top of the vehicle which he did.

Detective Mendez holstered his weapon and attempted to identify the suspect.

10. The suspect had some form of identification on him and he was identified as the Defendant, Rodney Taylor.

11. After the Defendant was identified, he was detained for "officer safety," to control the scene and because the vehicle was "associated with" Alexander Walton. The defendant is a light-skinned black male approximately six feet tall and weighing approximately 140 pounds. He has a smallish, thin build and wears his hair somewhat closely cut with a very thin beard.

12. Detective Mendez walked the Defendant over to the curb and sat him down on the curb where he was detained and remained there for twenty to twenty-five minutes. Detective Mendez did not place the Defendant in handcuffs during his encounter with the Defendant and the Defendant was not handcuffed while seated on the curb.

13. Detective Mendez conducted a "frisk" of the green Dodge Stratus for "officer safety" reasons and discovered a backpack [i]n the rear seat of the vehicle which contained roughly one-half of a box of live .38 caliber ammunition.

14. Alexander Walton was subsequently located and arrested [i]n an apartment in the immediate area. At that time, the officers believed Mr. Walton had committed the homicide they were investigating and they considered him their suspect.

When Detective Mendez stopped defendant, he believed that defendant could be Mr. Walton, who was wanted as a suspect in a recent homicide. Defendant—who is approximately the same height and size as Mr. Walton—was driving a car Mr. Walton was known to operate. Thus, the initial stop was justified. *See Hensley*, 469 U.S. at 229, 83 L.Ed. 2d at 612. Defendant argues that even if the initial detention was constitutional, the continued detention could not be justified once Detective Mendez discovered that defendant was not Mr. Walton.

After detaining defendant, Detective Mendez "frisked" the vehicle being driven by defendant and discovered a backpack containing approximately one-half of a box of live .38 caliber ammunition. At the time, police were still actively searching for Mr. Walton. "[A] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *McDaniels*, 103 N.C. App. at 181, 405 S.E.2d at 362 (citation, quotation marks, and brackets omitted). The stop here lasted approximately twenty to twenty-five minutes: the time it took to ascertain defendant's identity, secure the vehicle, and find Mr. Walton. The police detained defendant—who apparently

had the keys to and got into the suspect's vehicle—simply to maintain the status quo while they searched for Mr. Walton, as they are permitted to do. *See id.* Once Mr. Walton was arrested, the detention ended and Detective Mendez asked defendant if he would accompany him to the police station. Defendant was not in handcuffs while being detained. Under these facts, we conclude that both the initial and continued detention were constitutional.

Next, we must consider whether the interrogation of defendant at the police station violated his rights under the Fifth Amendment. Defendant contends that he unequivocally asked for an attorney, so continued questioning violated his rights under *Edwards v. Arizona*, 451 U.S. 477, 69 L.Ed. 2d 378 (1978). Defendant did not raise this argument before the trial court, either in his written motion or at the motion hearing, so it is not preserved for our review. N.C.R. App. P. 10(a)(1). Accordingly, we find no error in the admission of defendant's statement taken after he had been detained.

III. Relevance of Text Messages

Defendant next argues that the trial court erred in admitting a variety of irrelevant text messages over objection.[2] We disagree.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2013). "Even though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal." *State v. Peterson*, 205 N.C. App. 668, 674, 695 S.E.2d 835, 840 (2010) (citation, quotation marks, and brackets omitted).

The contested evidence consists of a series of text messages sent by defendant to various women and to "Mr. Business." The messages to the women were mostly sexual in nature. The trial court required the State to redact all incoming messages from anyone other than "Mr. Business," totaling 94 of 207 text messages, but allowed the State to introduce the outgoing messages. The State argues that these messages show that defendant premeditated and deliberated

---

[2] He does not argue that the unfair prejudice of the messages outweighed their probative value under Rule 403.

because within hours of the shooting he "was sending messages to several recipients indicating he was laughing out loud, was horny, and wanted to see pictures of girls . . . ." The State contends that this fact "makes it more probable that he shot [Mr. Johnson] in a cool state of blood."

Defendant was charged with first degree murder. To show that defendant was guilty of the charge, the State had to prove that defendant intentionally and unlawfully killed Mr. Johnson with premeditation and deliberation. *State v. Clark*, ___ N.C. App. ___, ___, 752 S.E.2d 709, 711 (2013), *disc. rev. denied*, ___ N.C. ___, 755 S.E.2d 619 (2014). "Generally, premeditation and deliberation must be proved by circumstantial evidence because they are not susceptible of proof by direct evidence." *Id.* (citation and quotation marks omitted). One of the factors relevant to determining whether a defendant acted with premeditation and deliberation is his conduct "before and after the killing." *State v. Horskins*, ___ N.C. App. ___, ___, 743 S.E.2d 704, 709 (citation and quotation marks omitted), *disc. rev. denied*, ___ N.C. ___, 752 S.E.2d 481 (2013).

Although these text messages may not have had great probative value, we cannot say that "the proffered evidence has *no* tendency to prove a fact in issue in the case[.]" *State v.*

*Coen*, 78 N.C. App. 778, 780-81, 338 S.E.2d 784, 786 (emphasis added), *app. dismissed and disc. rev. denied*, 317 N.C. 709, 347 S.E.2d 444 (1986). Defendant principally argued at trial that the shooting was a "mistake" for which he had shown remorse, or a "reaction" to the fact that Mr. Johnson pulled out the wine opener.   We agree with the State that defendant's texting girlfriends within several hours after the killing tends to show that he acted in a cool state of mind—killing Mr. Johnson did not seem to shake him or to make him alter his behavior in any apparent manner. *See State v. Singletary*, 344 N.C. 95, 106, 472 S.E.2d 895, 901 (1996) (considering, *inter alia*, evidence that the defendant "turned and walked away, as if he had done what he wanted to do" after shooting the victim).  Therefore, the messages had at least *some* probative value and the trial court did not err in concluding that they were relevant.

IV.  Closing Argument

Finally, defendant argues that the trial court erred in failing to intervene *ex mero motu* during the prosecutor's closing argument, which defendant contends was grossly improper because it misstated the beyond a reasonable doubt standard.

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so

> grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*. In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*State v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002).

> We will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fundamentally unfair. In determining whether argument was grossly improper, this Court considers the context in which the remarks were made, as well as their brevity relative to the closing argument as a whole[.]

*State v. Taylor*, 362 N.C. 514, 536, 669 S.E.2d 239, 259 (2008) (citations, quotation marks, and brackets omitted), *cert. denied*, 558 U.S. 851, 175 L.Ed. 2d 84 (2009).

In a case where the prosecutor misstated the reasonable doubt standard during his closing argument, our Supreme Court held that any error was cured by the trial court's subsequent correct instruction on reasonable doubt. *State v. Jones*, 336 N.C. 490, 496, 445 S.E.2d 23, 26 (1994). Similarly, in *State v. Alston*, the prosecutor misstated the reasonable doubt standard

during *voir dire*, but the Supreme Court held that "any misstatement in the law by the prosecutor was cured by the trial court's subsequent correct jury instruction defining reasonable doubt." 341 N.C. 198, 224, 461 S.E.2d 687, 700-01 (1995), *cert. denied*, 516 U.S. 1148, 134 L.Ed. 2d 100 (1996). There is no dispute here that the trial court correctly instructed the jury on reasonable doubt. Therefore, as our Supreme Court did in *Alston* and *Jones* we conclude that, even assuming the prosecutor misstated the reasonable doubt standard in his closing argument, "any misstatement in the law by the prosecutor was cured by the trial court's subsequent correct jury instruction defining reasonable doubt." *Id.*

## V.   Conclusion

For the foregoing reasons, we conclude that defendant has failed to show any error at his trial.

NO ERROR.

Judges STEPHENS and MCCULLOUGH concur.

Report per Rule 30(e).